## P. R. WALSH TIE & TIMBER CO. et al. v. MISSOURI PAC. RY. CO. et al. ABELES et al. v. ST. LOUIS, I. M. & S. RY. CO. et al.*

(Circuit Court of Appeals, Eighth Circuit. March 29, 1922.)

Nos. 5041, 5042.

1. Railroads ⟨⟩30—Reorganized corporation's report to state Public Service Commission held not to show general creditors could have been paid in cash.

Where the court found, in proceedings to foreclose a mortgage on railway properties, that the railway companies were insolvent, and were unable to raise funds to pay their current indebtedness and continue in operation, a statement to the state Public Service Commission by the reorganized corporation that its assets exceeded the amount of securities to be issued under the reorganization plan, was made on the belief that the continued operation of the railroads as reorganized would enable them to discharge their obligations, and does not show that the claims of the general creditors could have been paid in cash.

2. Railroads ⟨⟩30—Offer of preferred stock in reorganized corporation to general creditors held fair.

A plan for reorganization of railroads in the hands of receiver, whereby the general creditors were to receive preferred stock and the former stockholders of the corporation common stock, where it appeared that, if the mortgage had been foreclosed, the general creditors would not have been paid, and that the common stock issued to the stockholders had a market value, which would indicate the preferred stock was worth par, less a discount because of restriction on dividends, was fair to the general creditors, and not unduly preferential to the common stockholders.

Appeal from the District Court of the United States for the Eastern District of Missouri; William C. Hook, Judge.

Separate suits by the Commonwealth Steel Company against the Missouri Pacific Railway Company and against the St. Louis, Iron Mountain & Southern Railway Company, each of which was consolidated with a suit by the Guaranty Trust Company of New York and another against the respective defendants, and in which a receiver was appointed for the defendant corporation. From orders approving the plan of reorganization, whereby a new corporation acquired the prop-

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied July 7, 1922.

erty of both defendants, P. R. Walsh Tie & Timber Company and others, as general creditors of the defendant Railway Company in the first suit, and Robert Abeles and others, as general creditors of the railway company in the second suit, appeal. Affirmed.

Clifford B. Allen, of St. Louis, Mo., for appellants.

Edward J. White, of St. Louis, Mo. (E. G. Merriam, of St. Louis, Mo., on the brief), for appellees Missouri Pac. Ry. Co., St. Louis, I. M. & S. Ry. Co., and Bush.

Robert H. Neilson, of New York City (Carl A. De Gersdorff and Cravath & Henderson, all of New York City, on the brief), for appellees Holmes, Neilson, and Missouri Pac. Ry. Co.

Allen C. Orrick, of St. Louis, Mo. (Stetson, Jennings & Russell, of New York City, Nagel & Kirby, of St. Louis, Mo., and Edwin S. S. Sunderland, of New York City, on the brief), for appellees Guaranty Trust Co. and Edwards.

Miller, King, Lane & Trafford, of New York City, for appellees Union Trust Co. and Edwards.

Before SANBORN and LEWIS, Circuit Judges, and VAN VALKENBURGH, District Judge.

LEWIS, Circuit Judge. These cases present the same questions, were argued and briefed as one, and will be disposed of together.

Commonwealth Steel Company, a creditor, for rolling stock material and supplies sold to the Missouri Pacific Railway Company, to the amount of $145,000 filed its bill against that company on August 16, 1915, alleging that the defendant's lines of railway and equipment were subject to mortgage and other liens in a very large amount, that the net income from operation had not been sufficient in the two preceding years to pay the interest on those fixed obligations, and that there was immediate danger of the holders of those securities declaring a default and taking immediate possession of the defendant's railroad, that defendant was in need of funds for capital expenditures, that suits had been brought against it to recover excess charges for transportation of freight and passengers, and that claims of that character were asserted for more than $1,000,000 and the defendant was unable to pay them, that defendant was indebted for materials and supplies furnished to it, and for traffic balances and other operating liabilities in an amount exceeding $5,000,000, and was without funds to pay the same, that all of its assets were mortgaged or pledged and it was without collateral security or other means available to effect loans with which to meet its current liabilities, that there was grave danger of other creditors bringing suits and levying executions on the defendant's properties, or some part thereof, and in that manner the defendant would be greatly crippled in the operation of its lines of railroad and would not be able to operate it as a single system, and that in this way its railroad property would be dismembered and sacrificed, that the only means whereby the company could be able to pay its floating indebtedness and discharge its current obligations was by the continued maintenance and operation of its lines as a whole and uninterruptedly, that the defendant had made diligent efforts to obtain funds to meet said liabili-

ties and those efforts had proven unsuccessful, that unless action was taken on behalf of all creditors so that the operation of the railroad and its branches would be kept intact great and severe loss would be inflicted on the public and on a large majority in number and amount of the defendant's creditors, that owing to the aforesaid condition the market value of the securities issued by the defendant had greatly decreased in value, that the European war then prevailing, which had brought about disturbed financial conditions, further rendered it difficult for the defendant to meet and provide for its financial requirements, that in the preceding month the defendant promulgated a plan for the readjustment of its capital and indebtedness and that this had caused its stock issue to depreciate from $14 per share to $3 per share in the market, that said plan was opposed by the holders of various classes of defendant's securities and was not likely to be carried out and perfected, and that unless the court took custody of the defendant's railways and properties for the protection of every interest therein there was grave danger that individual creditors would assert their rights and seek different remedies in different courts, there would result a multiplicity of suits and a race of diligence, and that levies would be made upon rolling stock materials and supplies indispensable to the operation of the road. It was alleged that the intervention of a court of equity for the protection of the complainant's rights and the rights of others, and of the public, was immediately required and that a receiver should be appointed for that purpose. The bill prayed for a receiver to hold and operate the property, that the court fix and adjudicate the rights of all creditors, including the holders of mortgages, bonds and secured obligations, that the entire property and the assets of the defendant be marshaled and that the rights of all creditors be enforced against those assets, and for other appropriate relief. On the next day the railway company filed its answer admitting all allegations of the bill and joined in the prayer; and on the 19th of August the court appointed a receiver of all of its assets with power and direction to continue the operation of the road. On September 18th following, the Guaranty Trust Company of New York and B. F. Edwards, trustees in a mortgage covering the railway lines and branches, given and delivered to them in 1910, to secure the railway company's obligations known as First and Refunding Mortgage Fifty-Year Gold Bonds, filed their bill against the Missouri Pacific Railway Company, the mortgagor, in which they alleged that $31,778,000 of said first and refunding mortgage bonds were then outstanding, that default had been made in the payment of interest on said bonds, that demand had been made for the payment of the same and payment refused, that under the terms of said mortgage the complainants had a right of entry and foreclosure of said mortgage, that the income and revenues of the railway company were wholly insufficient to pay and discharge its indebtedness then due and owing, and that it had no resources with which to provide for the payment thereof and was insolvent, that the complainants were unable to execute their trust without the aid of the court, and the rights of all parties interested therein could not be ascertained and protected otherwise than by judicial sale. They prayed

for a receiver, that the railway property be sold as an entirety and that the proceeds be applied to the payment of said first and refunding mortgage bonds and the interest thereon and other debts. On October 8th the defendant filed its answer admitting the allegations of the bill, and thereafter, on October 27th, the court by an order consolidated the two causes and extended the receivership in the creditor's bill over the consolidated cause. Appellants represented to the court that they had claims for overcharges in transportation, the respective amounts being ascertainable only by an accounting, and the court by an order referred them and all other claims, other than claims of holders of bonds or other obligations secured by mortgage or pledge, to a special master, to hear and determine them. The receiver held and operated the railroad under the direction of the court until it was sold and delivered to the purchaser.

On the same day the Commonwealth Steel Company filed its bill of complaint against the Missouri Pacific Railway Company it also filed in the same court a like bill against St. Louis, Iron Mountain & Southern Railway Company, alleging that it was a creditor of that company in the sum of $55,335 for rolling stock material and supplies sold to it. Its allegations need not be repeated; they were like those in its bill against Missouri Pacific Railway Company. The defendant answered that bill on the next day admitting its allegations, and on August 19th the court entered an order appointing as receiver for that company the same person whom it appointed as receiver for the Missouri Pacific Railway Company. On August 8th following, the Union Trust Company and B. F. Edwards, as trustees in a mortgage given by the St. Louis, Iron Mountain & Southern Railway Company in July, 1912, to secure its issue of negotiable bonds, filed their bill against that company, alleging that bonds to the amount of $31,331,500, payment of which was secured by that mortgage, had been issued and were then outstanding, that default had been made in the payment of interest thereon, that under the terms of the mortgage the principal was also due, and that the railway company was insolvent. They prayed for a receiver, that the mortgage be foreclosed, the railroad sold as an entirety, and the mortgage indebtedness paid out of the proceeds. The Iron Mountain Company answered that bill on October 27th, admitting its allegations and joined in the prayer. On October 28th the two causes against the Iron Mountain Company were consolidated and the receivership extended over the consolidated cause. Appellants' claims for overcharges, like those in the Missouri Pacific case, were referred to a special master appointed to hear and determine the same. That road was also operated by the receiver until sale and delivery. Decrees of foreclosure and sale were entered in each case on December 21, 1916, in which the court found that each railway company was insolvent, that the amount due under the mortgage in suit in the Missouri Pacific case was $34,698,700, and in the Iron Mountain case $34,304,745, and ordered that the properties of the two railway companies be sold subject as to each to liens and prior mortgages on main and branch lines for large amounts. A plan of reorganization of the two companies and their properties into one had been formulated and copies thereof

had been filed in the causes; and the decrees, for the purpose of dealing with the contingency of acceptable bids being made to carry out that plan, set March 6th following as the time when objections to the plan would be heard by the court, and directed the clerk to give notice thereof by advertisements for four weeks in newspapers published in towns along the lines of both roads that objections to the plan of reorganization would be heard at that time. The notices as directed were given.

The two railroads had been operated for a long time as one, and had become known and recognized as the Missouri Pacific-Iron Mountain System. Their interests, both in operation and obligations to the public, were in large part in common. The securities of one had been used for the other. In fact, the Iron Mountain belonged to the Missouri Pacific in stock ownership, the latter holding all but $45,135 par of the issued stock of the former. Each road had branch lines on which there were underlying mortgages, and there were mortgages on each covering main and branch lines, all senior to the two mortgages set out in the foreclosure suits. Each had more than 3000 miles of operated lines in and through several States.

The special masters appointed to make the sales advertised them as directed by the court, and the two sales came on for February 21, 1917. The successful bidders for both properties were Duncan A. Holmes and Robert H. Neilson. They notified the special masters that their bids were made in behalf of a new company to be organized to take over both railroads, pursuant to the plan and agreement of reorganization that had been agreed on between the bondholders and stockholders of the two companies, and caused the masters to so report the sales to the court. On March 6th appellants came into court through their counsel and objected to the plan of reorganization. Their objection was two-fold; first, their claims are, they say, entitled to a preference and should be paid in full, and second, if they are only general creditors, they say they have not been fairly and equitably treated as against old stockholders. Their claims in large part, if not in their entirety, are for alleged overcharges in transportation rates paid under compulsion of an injunctive order against them which was vacated in Missouri Rate Cases, 230 U. S. 474, 33 Sup. Ct. 975, 57 L. Ed. 1571. The first objection was met by an order made on March 6th that appellant-claimants should have the right to prosecute their claims to final determination on the question as to whether they were entitled to preferences, which should not prejudice their right to participate in the plan and accept preferred stock in the new company as general creditors under the terms of the plan, if they failed to establish preferences and succeeded only in having their claims allowed as general creditors. The court then approved the plan of reorganization and confirmed the sales of the properties of the two to a new company to be organized, over the objection of appellants that the plan was not fair and equitable to general creditors; which is the one issue presented by this appeal.

Enough of the situation dealt with in the reorganization plan and the offers which it held out to the classes interested in and having claims against the two old companies and their railroads, material to a determination of the one question presented here, may be stated thus:

Speaking in round sums, the total funded debt of the two old companies held by the public was $279,000,000. It was proposed to reduce that by $60,000,000, thus increasing the available income balance annually $3,500,000. Forty million dollars was required to be used in part to take up Missouri Pacific Six Per Cent. Secured Gold Notes and Iron Mountain Equipment Trust Obligations, the remainder to be applied on present current obligations, new equipment, needed improvements and reorganization expenses. It was proposed to raise this sum by voluntary assessment on 83,000,000 Missouri Pacific common stock in the hands of the public, at the rate of $50 per share, for which they were to receive new General Mortgage Four Per Cent. Bonds and also shares of common stock in the new company to be organized, equal to the shares they held in the old Missouri Pacific. The reduction in the funded debt was to be brought about by an issue of 77,000,000 Convertible Five Per Cent. preferred stock in the new company, in lieu of mortgage bonds then outstanding against its lines and branches, including therein the 45,000 Iron Mountain common stock. The holders of preferred stock were entitled to receive five per cent. thereon each year before any dividends are to be paid on the common stock, and beginning July 1, 1918, dividends on the preferred stock are cumulative, that is, if there be a deficiency in any year in those dividends, that deficiency must be made up before any dividends are paid on the common stock. The preferred shares are also given a preference against the common to the new company's assets, in event of liquidation, together with all accrued and unpaid dividends thereon from June 30, 1918. The preferred shares are also given an equal voting power with the common, and are convertible into common at the holder's option. The plan proposed to give general creditors, estimated to hold claims for $1,000,000, shares of this new convertible five per cent. preferred stock equal in face value to their claims; and this is the offer to them which appellants say is unfair and inequitable as against the common stockholders.

[1, 2] They argue the point in two ways: First, they say that the new company, in its application to the Missouri Public Service Commission for authority to issue its stocks and bonds under the reorganization plan, represented that the assets which it took over were worth approximately $400,000,000, and that inasmuch as the old companies were liable on mortgage bonds and equipment obligations for an amount not in excess of $280,000,000, there was an equity ample to pay all general creditors in full, that they were entitled to share in that equity before stockholders receive any part of it, and that they should be paid. But counsel lose sight of the fact that the two companies had been adjudged insolvent, that they were unable to raise funds to pay their current indebtedness and continue in operation, that a foreclosure of the mortgages in suit and sales of the properties independently of the reorganization plan, was threatened, and that would have swept away and taken from them the chance and opportunity that they had under the plan of realizing something on their claims, and that the representations made to the State Commission were on the belief and expectation that the railroads, as reorganized, would continue in op-

eration, receiving compensation for the services that they would render the public, and thus be enabled to ultimately meet and discharge their obligations to them as preferred stockholders. They further lose sight of the fact that the offer made to them in the plan preferred them over common stockholders, and that their relative rights as against the stockholders in the old companies were not changed by the plan, except as to 450 shares of the Iron Mountain, which was too small to seriously affect their interests as proposed by the plan. Their complaint is that they were not paid in full rather than being offered preferred stock; but they did not point out to the court any way in which ready money could be raised for that purpose, and we are not advised that that could have been done. Secondly, they say that market quotations at about the time the plan was approved by the court, on bonds given to stockholders for the ready money which they voluntarily contributed, and on the common stock, as against market quotations on preferred stock, show that old stockholders were in a better position and were able to receive a greater percentage for their investments than general creditors would receive on their claims. The quotations referred to were $30 per share for common stock. But no argument is needed to demonstrate that if the common shares were intrinsically worth anything, preferred shares were intrinsically worth par, less a possible small discount because of dividends thereon being restricted to five per cent. To require others accepting the plan to give assurance that the general creditor could convert at once the securities offered to him into money at their face value, is but restating the contention that he should be paid now the amount of his claim in full. The acceptance of the plan by holders of mortgage bonds in excess of $60,000,000 superior in right to the claims of general creditors, and the surrender of those bonds for convertible five per cent. preferred stock, par for par, is a powerful refutation of the contention that general creditors were not fairly and equitably treated. The court gave full and careful consideration to the reorganization plan and appellants' objections, and in approving the former and overruling the latter said: "The general creditor has been treated very, very fairly indeed."

The purpose of the reorganization plan was to preserve the assets of the old companies for those who were entitled to share in them, to rehabilitate them and to put them on a financial basis that would enable the new company to continue the operation of the railroads; and we also think the offer made in the plan to general creditors was all they were equitably entitled to receive. Northern Pacific Ry. Co. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931; St. L. & S. F. Ry. Co. v. McElvain (D. C.) 253 Fed. 123; Guaranty Trust Co. v. Missouri Pacific Ry. Co. (D. C.) 238 Fed. 812.

In making the orders appealed from, approving the plan and agreement of reorganization and overruling appellants' objections, the trial court did not err.

Affirmed.