FLERSHEM et al. v. NATIONAL RADIATOR CORPORATION (FIRST NAT. BANK OF CINCINNATI et al., Interveners), and three other cases.

Nos. 4956, 4959, 5020, 5037, 5040.

Circuit Court of Appeals, Third Circuit.

March 24, 1933.

848

David M. Palley, Netter, Palley & Netter, A. H. Kaufman, and Sachs & Caplan, all of Pittsburgh, Pa. (Louis Caplan, of Pittsburgh, Pa., of counsel), for appellants Josephine Ramsey and others.

Alter, Wright & Barron, of Pittsburgh, Pa., and Miller & Hubbell, of Utica, N. Y. (Gifford K. Wright, of Pittsburgh, Pa., and James F. Hubbell, of Utica, N. Y., of counsel), for appellant International Heater Co.

Ralph Royall, of New York City, Baker & Watts, of Pittsburgh, Pa., and Ehrich, Royall, Wheeler & Walter, of New York City (Manfred W. Ehrich and Benjamin M. Robinson, both of New York City, and Sidney J. Watts, of Pittsburgh, Pa., of counsel), for appellant First Nat. Bank of Cincinnati.

Maynard Teall and Reed, Smith, Shaw & McClay, all of Pittsburgh, Pa., and Carlos L. Israels, of New York City (Lawrence Bennett, G. Franklin Ludington, and Milbank, Tweed, Hope & Webb, all of New York City, of counsel), for appellees.

Before WOOLLEY, Circuit Judge, and DICKINSON and KIRKPATRICK, District Judges.

WOOLLEY, Circuit Judge.

The National Radiator Corporation was engaged in the manufacture and sale of radiators, boilers and other instrumentalities of radiation. It was organized in 1927 by the consolidation or merger of six independent companies in the radiator industry. Preliminary to the consolidation an appraisal of their assets was made in the sum of $26,192,000 (speaking for convenience always in round numbers).

Upon the basis of this appraisal and a showing of earnings of the constituent companies for the previous four years in sums between $2,456,000 and $3,488,000 a year, the new corporation, with $2,972,000 in cash and current liabilities of $1,478,000, issued $12,000,000 Gold Sinking Fund Debentures, bearing 6½ per cent. interest, of which $10,705,000 became outstanding. It also issued 60,000 shares of $7.00 Cumulative Convertible Preferred Stock and 270,000 shares (no par value) of common stock at an estimated value of $11,500,000, making total liabilities to securityholders of all grades of about $23,000,000. Neither then nor later did it place mortgage liens upon its properties.

With this capital structure, completed in August, 1927, the new corporation embarked in business, and earned $993,000 in the last four months of that year. In 1928, however, the construction of residential, commercial and industrial buildings throughout the country, on which the business of the corporation was dependent, began to fall off. Immediately unfavorable competitive conditions developed. Construction work continued to decline, causing the corporation to suffer in each of the three years succeeding its organization an average deficit of $600,000 before interest on the debentures or a deficit of $1,310,000 after interest but before sinking fund charges. In this situation, which was becoming progressively worse, the corporation defaulted in interest on the debentures due February 1, 1931, though unquestionably having in hand more than enough money to pay it. A Reorganization Committee, being appointed, set to work and evolved a plan to which we shall advert presently. To this plan about 96 per cent. of the securityholders assented. About 3 per cent. stood silent and 1 per cent. objected. This took time. Another interest payment came due August 1, 1931, on which the corporation defaulted. It defaulted also on its sinking fund obligation, though having enough money in hand to pay the former and partially, if not wholly, to meet the latter. During these successive defaults the corporation was, naturally enough, harassed by suits and threats of suits. To prevent waste in the creditors' race of diligence and to protect se-

curityholders, the members of the Reorganization Committee, on October 1, 1931, filed a bill in the District Court praying for the appointment of receivers. Their prayer was granted.

The receivers, nine or ten months after their appointment, asked the court for an order authorizing them to sell all the assets of the corporation at a judicial sale for an upset price to be named by the court and under terms of the Reorganization Plan. The plain purpose of the application was to dispose of the corporation's assets in a manner which would conserve and hold them as a going concern for the protection of the senior securityholders.

 The court made such an order. In August, 1932, the receivers sold all the assets on the bid of the Reorganization Committee and the court confirmed the sale. The position of the objecting securityholders (now appellants) is that, assuming but never conceding its jurisdiction to order and confirm the sale, the court erred in fixing the upset price of $2,500,000 and in confirming the sale for $2,550,000.

On the motion for an order of sale the learned trial judge set about to fix an upset price by determining the fair market value of the assets, an almost insuperable task when considered with respect to their character, the feeble market for some of them and, in these extraordinary times, an entire absence of a market for others. He had before him book values of upwards of $18,-000,000 which, manifestly, were values out of all relation to the actualities. He was dealing with a proposed sale in the midst of a great business depression and therefore was concerned with selling values; doubtless realizing that, ordinarily, a thing is worth only what it will fetch. He called upon all parties for evidence on the subject. The complainants, at a hearing lasting four days, produced a mass of facts, figures and opinions; the objecting securityholders produced nothing. On the uncontradicted evidence, which was all he had to go on, the learned judge set an upset price for all assets of the corporation at $2,500,000, or $200,000 more than the highest figure the witnesses had given of what might be expected in liquidation.

We have at much labor studied and absorbed this record. A recital of the mass of facts and figures would add nothing to the decision of the case. It will be sufficient to say that, notwithstanding what on first view is a startling disparity between book values and market values, we cannot find on the evidence that the learned judge erred in naming the price in the order of sale. If the upset price of $2,500,000 reflected the fair market value of the assets, we cannot find on the assignment charging error in confirming the sale that the purchase price of $2,550,000 was inadequate. At this figure, the purchase price was two per cent. above the upset price and ten per cent. above the highest price the evidence indicated as likely to be realized in liquidation.

The assignments charging error in the order of sale and the order of confirmation are dismissed.

The law of the case arises out of a demand by the appellant-securityholders that they be paid and, to that end, the corporation be put in liquidation, and out of their challenge of the jurisdiction of the court to appoint receivers and order a sale of assets under the proposed plan of reorganization which they say was devised by certain securityholders and officials of the corporation and the trustee for the debentures in fraud of other securityholders.

We shall briefly dispose of the last question—collusion and fraud—by giving our judgment, which is in complete accord with the finding of the learned trial judge, that while the evidence shows consultation and co-operation between these several parties in formulating the plan it does not disclose collusion or fraud.

We have now reached the central question in the case, that of jurisdiction of the court to entertain the bill for receivers. It is pertinent to note the bill did not say the corporation was insolvent. That, in effect, was a tacit admission or declaration of its solvency. The corporation, by its answer, admitted the truth of all allegations of the bill.

Concededly, the corporation was solvent in the sense of having fluid assets enough to pay its debts then due in the usual course of trade—without giving thought to the consequences. It was perhaps not then known, as was subsequently proved, that the corporation was insolvent within the definition of the Bankruptcy Act, § 1a, cl. 15 (11 USCA § 1(15), where "the aggregate of (its) property * * * (was) not, at a fair valuation, sufficient in amount to pay (its) debts." Whatever may have been the corporation's condition as to solvency at the time of bringing the action, clearly the bill was filed on the assumption of its solvency, yet on the need of a conservation receivership for the

protection of securityholders who ranked as creditors. Although after the appointment of receivers and before sale of the assets, the Bankers' Trust Company, trustee for the debentures, brought two suits against the corporation, one for interest in arrears, the other for the principal of the debentures, and obtained judgments in the aggregate amount of $11,674,000, thereby indicating, as a practical matter, that the corporation was then insolvent within any of the definitions, we shall continue to regard the receivership, according to the tenor of the bill, as one for conservation of assets. In this connection it should be noted as bearing on the court's jurisdiction that the complainants in the bill were not judgment creditors. The respondent corporation, however, tacitly waived that fact and expressly consented to the decree. Pusey & Jones Co. v. Hanssen, 261 U. S. 491, 497, 43 S. Ct. 454, 67 L. Ed. 763; Shapiro v. Wilgus, 287 U. S. 348, 53 S. Ct. 142, 77 L. Ed. ——. Thereafter the Bankers' Trust Company, plaintiff in the two judgments and then a judgment creditor of the corporation, was allowed to intervene as party-plaintiff in this case and thenceforward participated in its prosecution.

■ The appellants' attack on the jurisdiction of the court to entertain the bill, appoint receivers and order a sale of assets as an entirety is disclosed by the three questions they have presented:

(1) "May a federal court of equity, in the absence of other equitable grounds, take jurisdiction of a foreign corporation which is solvent and able, in regular course, to pay its obligations in full, for the primary purpose of reorganizing it?"

(2) "May a federal court of equity, in the absence of other equitable grounds, and solely for the purpose of reorganizing a corporation which is not insolvent nor in imminence of insolvency appoint receivers to take possession of such corporation's property until it can be sold?"

The plain answer to these questions is "no."

The phrase "in the absence of other equitable grounds" compels this answer because it excludes the essence of the court's jurisdiction in such matters. It is the presence of equitable grounds calling for relief in equity which gives the court jurisdiction. A court of equity is not a forum of convenience to be used by a corporation merely to straighten out its business difficulties or to rebuild its financial structure. Nor is it a place of refuge to which debtors may go for protection against their creditors and against the remedies of suit, judgment, execution and sale which the law affords them. Debtor corporations are not wards of chancery. There is nothing in the mere fact of a corporation's indebtedness, nor in its inability to pay, nor in its wish to make some composition with its creditors that confers equitable jurisdiction upon a court. It is only when there is something in a situation which sets up an equitable right and admits of equitable relief that parties may go into a court of equity and assert one and obtain the other. Common instances are where a corporation is insolvent or where its insolvency is imminent. Even in the latter case the right of a federal court of equity (cautiously exercised) to appoint receivers at the instance of simple contract creditors if the debtor corporation consents, is not, as one of the appellants admits, debatable. Michigan v. Michigan Trust Co., 286 U. S. 334, 52 S. Ct. 512, 76 L. Ed. 1136; Shapiro v. Wilgus, 287 U. S. 348, 53 S. Ct. 142, 77 L. Ed. ——.

■ The appellants' third question, however, contains no nullifying exceptions and goes directly to the point. It is:

(3) "Does the bill of complaint in the primary cause set forth facts sufficient to constitute a cause of action for the appointment of receivers or for other equitable relief?"

The bill must, as we have stated, have equity, and equity will not lie in the mere fact, if such were the case, that the corporation could not pay interest. Here the corporation could presently pay, but payment foretold imminent consequences disastrous to the corporation and, what is more to the point, disastrous to its securityholders. Plainly those consequences were insolvency with its attendant evils to all concerned. The fact that the corporation had in hand sufficient money to meet certain current indebtedness did not alter the underlying conditions. Continental & Commercial T. & S. Bank v. Allis-Chalmers Co. (D. C.) 200 F. 600, 613; In re Babcock (C. C. A.) 26 F. (2d) 153. The facts of the situation, showing, as we find, imminence of insolvency and collapse, calling for protection of creditors, constituted a ground of equity for which relief could validly be asked by simple contract creditors within the law of Pusey & Jones Co. v. Hanssen, 261 U. S. 491, 43 S. Ct. 454, 67 L. Ed. 763, and within the warning of Shapiro v. Wilgus, 287 U. S. 348, 53 S. Ct. 142, 77 L. Ed. ——. The case therefore falls within the rule distinguished and

succinctly stated by Judge Learned Hand in Luhrig Collieries Co. v. Interstate Coal & Dock Co. (D. C.) 281 F. 265, 268, 269. There he showed that a bill of the character of this one, filed by simple contract creditors, is an evolution out of the judgment creditors' bill to supplement the writ of execution, of which a court of equity may, with caution, assume jurisdiction with the consent of the debtor corporation. In re Metropolitan Railway Receivership, 208 U. S. 90, 28 S. Ct. 219, 52 L. Ed. 403. He then said:

"But if it appears that the assets of every kind are not enough to pay all creditors, if left to a general welter of attachments, executions, and separate creditors' bills, a different situation is presented. The corporation may well be solvent if its assets be nursed along, and insolvent if they be thrown to the creditors for piecemeal sale. Recognizing in such event that creditors' bills will in the end be necessary, though unsuccessful, equity will anticipate them by presently stepping in, in the interest of securing the greatest possible payment ratably for all creditors, since the protection of creditors is an interest of equity as well as law."

We find that on the bill, and on the evidence to which we cannot close our eyes, the court had jurisdiction.

The remaining question is whether the holders of old debentures, 96 per cent. assenting, should be required to take new securities under the plan. The answer to this question depends on whether the proposed distribution of the new securities, as to character and quantity, is fair?

On the first question the appellants insist that holders of debentures, being "creditors, must be paid in full before any interest in the new company can be given to the stockholders of the old corporation," citing Northern Pacific Railway v. Boyd, 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931, or, failing payment, there should be imposed against the property of the corporation liens for the full amount of their claims. As the appellants have no greater right to liens than to payment, we shall limit our discussion to their claim for payment. If by the expression "paid in full" they mean that the debenture holders must be paid in cash, the Boyd Case is not authority for that position. If they mean that, as non-assenting securityholders, they cannot be required to take securities in the new corporation which fairly represent in value and preference securities they hold

in the old corporation, Phipps v. Chicago, R. I. & P. Ry. Co. (C. C. A.) 284 F. 945, 949, 28 A. L. R. 1184, and the Boyd Case itself (page 508 of 228 U. S., 33 S. Ct. 554, 561) are authorities against them. St. Louis-San Francisco Ry. Co. v. McElvain (D. C.) 253 F. 123; P. R. Walsh Tie & Lumber Co. v. Missouri Pacific Ry. Co. (C. C. A.) 280 F. 38, 44; Temmer v. Denver Tramway Co. (C. C. A.) 18 F.(2d) 226.

In the case of Northern Pacific v. Boyd, where common stock in an old corporation was exchanged for common stock in a new one to the exclusion of creditors, the court held that a transaction in which stockholders are preferred to creditors is invalid. In the instant case holders of common stock in the old corporation will, under the plan, be given nothing in the new corporation. They will, however, be accorded the right to buy, for $1.00, a stock warrant for each three shares of old common stock they may own. One stock warrant gives them the right to buy, before July 1, 1941, one share of new common stock at $20. The stock warrant, when bought and issued, is not a security of the corporation; it is rather a chip giving a right to gamble. Thus holders of old common stock, who, seemingly, are not complaining, stand aside, leaving the holders of old debentures and old preferred stock as the only ones to be considered in determining whether the proposed distribution is fair.

The proposed plan of distribution was evidently made on the theory that the assets of the corporation, represented by new securities, belong to creditors rather than to the corporation, Coriell v. Morris White, Inc. (C. C. A.) 54 F.(2d) 255, and belong particularly to senior creditors. It is manifest that the new corporation, as in the case of the old one, could not continue business in these times and survive periodical fixed interest charges. Earnings necessary to that end were not and, for a time, may not be forthcoming, hence the provision in the plan for new debentures with interest payable at 5 per cent. when earned. New debentures—really income bonds without lien yet protected against mortgages by a provision for equality—will be given only to holders of old debentures— $500 new for each $1,000 old. Stockholders, either preferred or common, will get none of them. So far, the substituted debenture is of the same grade as the old one, differing in interest rate and in time of interest payments.

In addition the holder of $1,000 old debentures will receive 5 shares (no par value)

of 7 per cent. new preferred stock. The interest rate of the new preferred stock is higher than the interest rate of the old debenture but is payable only when earned, cumulative after an early date. As the new preferred stock is at present to be distributed only to holders of old debentures, there is little difference between them as to grade and preference. Then, finally, the holder of $1,000 old debentures will receive 20 shares of new common stock for what they may be worth.

Old preferred stock will be exchanged for new common stock, share for share. Holders of these securities apparently are not complaining. Certainly the holders of debentures cannot complain of a stock distribution that does not affect them.

And, finally, the new corporation will assume and pay the liabilities of the old corporation for taxes, wages, services and merchandise amounting to about $42,000.

We can understand why 96 per cent. of the securityholders regard this distribution as fair, particularly as none of the appellants or any one else has suggested any plan that is better or different. It is in our judgment fair and equitable.

█ The appellants, however, while declaring the plan of distribution unfair, are opposed to any plan because they say neither this one nor any other can hold out a promise of success. Therefore they insist upon immediate and complete liquidation of the corporation's assets. Notwithstanding the lack of purchasers and the probability of receiving nothing, they take the stand that they prefer, and in law have a right, to know and accept their fate now.

We are constrained to hold, however, that as against the rights of all other creditors they cannot in equity prevail.

In reaching this judgment we have brought into force no new principles of equity. We have simply applied to new facts old principles found in the zone in which the Boyd, Phipps, Luhrig Collieries, Pusey & Jones and Shapiro Cases are landmarks.

█ There remains a matter raised on appeal by the International Heater Company, one of the intervening defendants, which is not free from difficulties. It appears that two of the companies entering into the merger held two-thirds of the capital stock of Lincoln Radiator Company, the other one-third being held by the International Heater Company, which stayed out of the merger. This one-third interest was acquired by the respondent corporation from the International for $100,000, of which $60,000 remains unpaid, evidenced by an equal face amount of promissory notes due serially at the rate of $20,000 per annum. These promissory notes and the corporation's outstanding unsecured debentures constitute its entire funded debt. The plan of reorganization covers an offer to the International of securities of the same character and number that are offered to holders of the old debentures. The International says, however, that it never held the corporation's debentures or other formal securities; that, as a creditor under the corporation's notes of hand, it is entitled to payment in cash and therefore has attacked what was done by the court below.

Our trouble has been in classifying the International Heater Company as a creditor, feeling that if properly classified its rights would be those of the class of which it is a member. Manifestly, it is not a secured or a preferred creditor. It is not a merchandise creditor or a creditor in respect to debts currently incurred in the usual course of the corporation's business. It neither sold the corporation merchandise nor rendered it service. It simply sold it shares of stock in another corporation. The notes which were received therefor are indicative that the payee, the International, is a general creditor, nothing more, nothing less. Being so, it stands on the same plane with holders of the debentures who, likewise, are general creditors. Therefore we can see no difference between the two in law and none in the consequences of the receivership. Yet, just here, the International takes the position that there is a difference between itself and holders of debentures, as general creditors, in that it did not buy debenture securities of the corporation with their attendant hazards but accepted its notes promising payment for property sold and assigned, and that not having bought into the corporation's difficulties it stands outside of matters involving their solution and should be discharged with full payment of its claim in money. This distinction does not appeal to us as controlling, for the International voluntarily became a general creditor of the corporation, is, as such, involved in its difficulties and can get out only by the means which the court has afforded general creditors who, without regard to the origin of their claims, have that status at the time the securities representing the corporation's assets are to be distributed.

All orders and decrees of the District Court here on appeal are affirmed.