## TRUSTEES SYSTEM CO. OF PENNSYLVANIA v. PAYNE et al., and four other cases.

### Nos. 5077–5081.

Circuit Court of Appeals, Third Circuit.
May 1, 1933.

104

Charles A. Wolfe and Montgomery & McCracken, all of Philadelphia, Pa., for appellants.

Grover C. Ladner, Harry Felix, and Roy Livingstone, all of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

These appeals are from like decrees of the District Court appointing receivers for the five defendant corporations in very exceptional circumstances. The questions involved are jurisdictional. As questions of jurisdiction are to be determined from the allegations of the bills, not from the facts as they may turn out, Mosher v. City of Phoenix, 287 U. S. 29, 30, 53 S. Ct. 67, 77 L. Ed. 148, and rest accordingly on whether the allegations set forth a substantial claim in equity, Levering & Garrigues Co. v. Morrin, 289 U. S. ——, 53 S. Ct. 549, 77 L. Ed. ——, we shall decide the case on the bills (all being substantially the same) and on a stipulation by counsel rather than on the evidence. These show that many closely linked corporations were engaged in different ways in a single comprehensive business of lending to homeowners small sums of money, not in excess of $300 to each borrower, and selling to them, or any one else, securities of certain of the corporations.

This business was conducted on a huge scale in eight states through the media of thirty corporations organized in groups of which the Pennsylvania group, the only one with which we are concerned, is an example.

The Trustees System Service Corporation, organized under the laws of Virginia with its main offices at Chicago, was the center of the system and in this litigation is referred to as the parent corporation. It owned all the capital stock (except qualifying shares) of the Trustees System Company of Pennsylvania which for convenience we shall call Trustees of Pennsylvania. This corporation owned in turn all the stock of the Trus-

tees System Company of Reading and the Trustees System Company of Philadelphia, called, respectively, Trustees of Reading and Trustees of Philadelphia. Trustees of Reading owned all the stock of Trusco Company of Reading, and Trustees of Philadelphia owned all the stock of Trusco Company of Philadelphia, herein referred to, respectively, as Trusco of Reading and Trusco of Philadelphia. The five subsidiaries are, it is averred, corporations of Pennsylvania. Their capital, paid in or earned, is not stated.

The corporate structure of the system however did not end here. Two more corporations were tied up with those we have named. These were the Industrial Loan and Guaranty Company and the Trustees System Extension Corporation, regarded and referred to as affiliates. Their capital structure is not given nor is it important. Enough is stated to show that the Industrial owned in some instances practically all and in others a majority of the several classes of common stock of the parent corporation, and Extension owned certain of its preferred stock. Of the balance much was owned by the public. There is nothing to show who owned the stock of Industrial and Extension.

The six system corporations were organized and they function in this fashion: F. J. Gibbons, the president, and J. G. Born, the secretary-treasurer of the parent corporation, were the president and secretary-treasurer of each of the subsidiary corporations. They also constituted a majority of the board of directors of the parent corporation and, similarly, a majority of the boards of directors of the five subsidiary corporations. Thus all corporate powers were reposed in these two men.

For convenience in illustrating what the systems did in their different spheres of operation, we shall run down the line of descent from the parent corporation at Chicago to its Philadelphia offsprings, the Reading line, and the lines elsewhere, being the same except in name and place.

The system made its profits from interest on money loaned and from the sale of stock of the parent corporation and of "gold notes" of that corporation—unsecured promissory notes payable in gold—and gold notes of Trustees Systems in various cities, in this case Trustees of Philadelphia, guaranteed by the parent corporation. (Outstanding guaranteed gold notes of all subsidiaries amount to $5,217,704.) Money acquired from the public flowed through the system in this way: The Truscos were supplied by the parent corporation in Chicago with money with which to make loans to the public. The Trusco of Philadelphia, for instance, on receiving such a loan immediately became a debtor of the parent corporation for the amount advanced. This money was deposited to the credit of Trusco in one bank and was drawn upon for local use. Money received from the public in payment of interest, repayment of loans and purchase of gold notes was placed in another bank not subject to withdrawal locally but to be withdrawn only by the two officers of the parent corporation in Chicago, who, as we have shown, were likewise officers of Trusco of Philadelphia and of the other subsidiaries. In this way money flowed from all the far-flung Trusco Companies to a central reservoir at Chicago, that of the parent corporation. But all of it did not stop there, for the reservoir had two outlets. Through them much money flowed to the Industrial and Extension corporations, promotion affiliates, in payment of promotion costs and commissions, amounting in the case of the Extension for the years 1930, 1931 and ten months of 1932 to $5,120,000, and thence on to their stockholders whoever they were.

It should be kept in mind that profits could be earned by one corporation or another only from the use of the parent corporation's money or from the purchase of the corporations' securities by the public, loaned, sold and collected by the Trustees of Pennsylvania, Trustees of Philadelphia and Trusco of Philadelphia, which occupied the same office, had the same controlling officers and were served by the same employees, and that the money so received by one or another of these corporations could be drawn out and sent west by the two officers common to all of them. The precise position of the Trustees of Pennsylvania and Trustees of Philadelphia as money earners in the system is, except as to the sale of notes, a little vague. But it is very clear that by reason of the identity of officers and of a majority of the directors in all the corporations, those officers could at will, according to the money needs of the parent corporation or for any other reason, keep one, or another, or all of the underlying corporations solvent or insolvent.

On October 28, 1932, the District Court of the United States for the Northern District of Illinois appointed receivers for the parent corporation at Chicago. Thereupon the whole thing collapsed. Immediately there sprang up a Protective Committee composed of citizens of New York who, on an averment that they were stockholders and note holders of the parent corporation under a deposit agree-

ment whereby all the right, title and interest of original stockholders and note holders (in excess of $3000) were transferred to them and that "by reason of said agreement" they became creditors and stockholders, respectively, of the five defendant corporations, filed six bills in the District Court of the United States for the Eastern District of Pennsylvania for receivers of the six corporations, one ancillary to the Chicago receivership, the others nominally primary, "in order to preserve the status of the creditors in the State of Pennsylvania with respect to the above corporation(s) in view of the attitude (ability) of the receivers of the parent corporation" to drain the money from the Pennsylvania subsidiaries to the central receivership at Chicago. Regarding the decree for receivers of the parent corporation in Illinois as evidence of a proper case for the appointment of receivers in Pennsylvania, 23 R. C. L. § 157; Bluefields S. S. Co. v. Steele (C. C. A.) 184 F. 584, the court appointed ancillary receivers for the parent corporation and "permanent" receivers for each of the subsidiary corporations. The receivers were the same in each case. The main receivers for the parent corporation did not resist nor have they appealed from the appointment of ancillary receivers but the five defendant subsidiary corporations, evidently acting in concert with authorities in Chicago, have appealed from the decrees of the court below on a variety of grounds in which they are wholly right or wholly wrong according to what the bills disclose to be the real situation in equity.

Reduced to simplest terms, appellant-defendants in these five cases contend that the decrees appointing receivers and making them permanent should be vacated and the bills dismissed for want of equity, because

(1) The plaintiffs have no equitable interest in the defendants either as creditors or stockholders.

(2) The bills do not pray for any equitable relief.

(3) The bills show on their face that the defendant corporations are solvent.

(4) The Trustees System Company of Pennsylvania is a foreign corporation with no fixed assets in this jurisdiction.

(5) The bills were not verified by oath of plaintiffs or some one having knowledge of the facts.

All of these contentions are based squarely on the proposition that the primary receivers were appointed for five separate and distinct corporations, all of which were sol-

vent, on the motion of persons who were neither stockholders nor creditors. If these five subsidiaries were so independent of the parent corporation and of one another that the stockholders and note holders of the parent corporation had no interest in them, it follows that the plaintiffs have no equitable right and the court could afford no equitable relief in respect to them and, in consequence, the defendant corporations must prevail absolutely. If, on the contrary, these five separately created corporations have failed to keep apart and maintain independence, it may be that their case will fail and the decrees be sustained.

These are the central questions about which the whole case revolves. On their answers, one way or another, the law will fall into its proper place and the decision will plainly follow.

In approaching these questions we are confronted by certain fixed principles of equity which cannot be overlooked and therefore should be met frontally. This we shall do.

Assuming for the moment that the plaintiffs are creditors and stockholders of the defendant corporations, we first inquire whether as such they have any equitable rights to be relieved; and assuming, as we must on the averments of the bills, that the defendant corporations are solvent, we next inquire what relief a court of equity can afford the plaintiffs?

On these assumptions the plaintiffs technically are stockholders and unsecured simple contract creditors of solvent corporations which, before resorting to legal remedies, they sought to put into receivership. From this plain statement of the case we have assumed and (a part) which the defendants have asserted, the inhibitions of the law stand out boldly. A stockholder of a solvent corporation has, save in exceptional circumstances, no right to ask for, and a court of equity has no power to order, the appointment of receivers. Nor has a court of equity power to appoint receivers for a corporation, solvent or insolvent, on a bill filed by unsecured simple contract creditors unless the corporation waives the question of jurisdiction and consents to a decree. Flershem et al. v. National Radiator Corporation et al. (C. C. A.) 64 F.(2d) 847; In re Metropolitan Railway Receivership, 208 U. S. 90, 109, 110, 28 S. Ct. 219, 52 L. Ed. 403. This is for the reason that "an unsecured simple contract creditor has, in the absence of statute, no substantive right, legal or equitable, in or to the property of his corporate debtor." His

only substantive right is to have his debt paid in due course. "His adjective right is, ordinarily, at law. He has no right whatsoever in equity until he has exhausted his legal remedy." Having exhausted his legal remedy, and the debt or a portion of it remains unpaid, he may resort to equity by a creditor's bill. Hollins v. Brierfield C. & I. Co., 150 U. S. 371, 14 S. Ct. 127, 37 L. Ed. 1113; Pusey & Jones Company v. Hanssen, 261 U. S. 491, 43 S. Ct. 454, 67 L. Ed. 763; Michigan v. Michigan Trust Company, 286 U. S. 334, 52 S. Ct. 512, 76 L. Ed. 1136; Shapiro v. Wilgus, 287 U. S. 348, 53 S. Ct. 142, 77 L. Ed. 355; Flershem et al. v. National Radiator Corporation (C. C. A.) 64 F. (2d) 847. And so, if these five defendant corporations were separate and distinct entities, independent of the parent corporation and of one another, the decrees appointing the receivers cannot be sustained and that is the end of the case.

■ But the court will not accept the independence of these several corporations from the mere fact that they were separately created. It is bound to regard the uses to which they were put in the huge financial scheme, examine the part they were made to play by powers equally controlling upon all of them and determine whether the things they did were done separately for themselves or jointly for others. The court must, as it may, determine whether the five corporations were separate entities or were mere departments or agencies of the parent corporation. It must look and see whether in fact all these corporations were one, and whether there was that identity which lifts them out of the law of separate entities. We surmise that it was to avoid this very thing that the highly complex corporate structure of the scheme and the capital structure of the corporate units were created. The corporate and capital structure of the Pennsylvania group fairly bristles with legal obstacles to invasion by creditors or disturbance by stockholders. If the structure as originally conceived is left undisturbed, the receivers for the parent corporation can do very much as the parent corporation itself did before the receivership, that is, drain off assets from the subsidiaries and dispose of them without ancillary receiverships to guard local assets and watch over local creditors, thus leaving the local corporations financially dry and compelling their creditors to betake themselves to Chicago.

■ It is recognized in principle that the fiction of corporate entity may be disregarded where one corporation is so organized and controlled and its affairs are so conducted that it is, in fact, a mere instrumentality or adjunct of another corporation. Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Association, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; In re Rieger et al. (D. C.) 157 F. 609; Brown v. Pennsylvania Canal Company (C. C. A.) 235 F. 669; Brown v. Pennsylvania R. Co. (C. C. A.) 250 F. 513; Industrial Research Corporation v. General Motors Corporation (D. C.) 29 F. (2d) 623, 625; Central Republic Bank & Trust Company v. Caldwell (C. C. A.) 58 F. (2d) 721. Through long practice courts have not hesitated to disregard the doctrine of corporate entities when the facts justify it. Although we know of no instance in which it has been done in matters of receivership, we cannot see why the same power does not exist in a court or why the law does not impose upon a court the same duty in a receivership matter when, as here, the facts are substantial enough to justify, indeed to compel, a finding that the five corporations were so identified with the parent corporation as to be a part of it. Being of opinion that the law makes no exception of receiverships, we tear asunder the legal maze of corporate fiction in which they have enveloped themselves and, observing that the six corporations were not merely related by stock ownership but, like wheels in a machine, were so closely meshed that all functioned together, we find from the bills that in legal effect they were one, a finding in consonance with the casual statement of the attorney for the parent corporation at the hearing that "the whole thing from Alabama to Pennsylvania is really one company."

That finding changes the whole point of the several contentions which the appellant-defendants have made in respect to themselves as separate entities and, renders inapplicable the authorities cited to sustain them. We shall, nevertheless, very briefly dispose of their contentions as they bear on a situation of the unitary character we have found this one to be.

■ As to the appellants' first contention that "The plaintiffs (constituting a Protective Committee) have no equitable interest in the defendants either as creditors or stockholders," 53 C. J. 27, § 12; Pusey & Jones Company v. Hanssen, 261 U. S. 491, 43 S. Ct. 454, 67 L. Ed. 763, it should be observed that the plaintiffs averred in the bills that they were holders of stock and notes of the parent corporation in sums above the jurisdictional amount by reason of assignments by holders thereof under a deposit agreement of all their right, title and interest

therein. Assuming, as we must, the truth of this averment, that made the plaintiffs at least unsecured simple contract creditors of the parent corporation, with a right to sue or proceed thereon. Bullard v. City of Cisco, Tex. (C. C. A.) 62 F.(2d) 313, 315. On this showing ancillary receivers for that corporation were appointed without opposition. The plaintiffs further averred that by reason of that ownership they were creditors of the five defendant corporations. The validity of that averment turns on the question we have decided whether the Pennsylvania group of corporations had maintained or lost their separate entities. Having found that they had not maintained them, the plaintiffs' character of creditors of the parent corporation extends to the corporate departments or agencies which it embraced. Although holders of gold notes of one of the Pennsylvania subsidiaries, guaranteed by the parent corporation, have intervened, either seasonably or belatedly, we shall, in adhering to the bills, hold the plaintiffs to their own showing. This compels a finding that they had equitable rights sufficient to move for an ancillary receivership for the parent corporation, which is not questioned, and, in view of the identity of the several corporations, they had equitable rights sufficient to move for and obtain receivers for the five defendant subsidiary corporations which, though termed primary receivers, are in principle, because of unity, ancillary receivers. Gatch, Tennant & Co. v. M. & O. Ry. Co. (D. C.) 59 F.(2d) 217.

The appellants' next contention—that "the bills do not pray for any equitable relief"—we regard as insubstantial. The bills expressly pray for receivers for the five defendant corporations in order that the entire matter may be co-ordinated with the ancillary receivership and the plaintiffs' rights in respect to the defendant corporations be adjudicated, that is, the right to conserve their assets and have distribution thereof—whether in the ancillary jurisdiction or in that of the main receivership, 23 R. C. L. § 157—in the way prescribed by equity in relation to ancillary and primary receiverships. Superior Cabinet Corporation v. American Piano Company (D. C.) 39 F.(2d) 87; Clark on Receivers (2d Ed.) § 321; Frowert v. Blank, 205 Pa. 299, 54 A. 1000. This, clearly, is relief which equity can and, on a proper showing, will afford. Such a showing, we hold, has been made.

The appellants next contend that the bills reveal that the defendant corporations are solvent. They do. But that does not help the appellants on our finding of lost entities. If a main receivership be granted for a solvent corporation, its solvency does not prevent a court in another jurisdiction from appointing ancillary receivers, Brooks v. Smith (C. C. A.) 290 F. 33, which is what the court below did in fact as to one receivership and in principle as to the others, not to wind them up but to protect local creditors as to local assets in the administration of their affairs. We are not informed whether the parent corporation is solvent or insolvent. The indications are that it is insolvent.

The appellants' fourth contention is that "Trustees of Pennsylvania is a foreign corporation with no fixed assets in Pennsylvania." Whether or not that is true is not disclosed by the record, nor is it a subject of any assignment of error unless it be read from such general assignments as "the court erred in appointing receivers," "the court erred in entering the decrees." Lack of specification in these assignments will not permit us to review the question raised here for the first time.

And, finally, the appellants' contention that "the bills are not verified by oath of the plaintiffs (the Protective Committee) or someone having knowledge of the facts," falls, on the bills' own showing that they were verified by oath of Harry Wallach, a member and the secretary of the Protective Committee, and therefore one of the unsecured simple contract creditors, to the effect that "the facts set forth are true and correct to the best of his knowledge, information and belief."

Equity Rule 25, subd. 5 (28 USCA § 723), is invoked in cases of "special relief pending the suit," ordinarily in matters of injunction. This of course must be "by the oath of the plaintiff, or someone having knowledge of the facts upon which such relief is asked," yet even if the application for the appointment of ancillary receivers in fact or in effect be a "special relief," we regard the verification in this instance adequate in view of the position of the affiant and the facts alleged and not controverted.

The several decrees of the District Court here on appeal are affirmed.