**UNITED STATES et al. v. KENSINGTON SHIPYARD & DRYDOCK CORP. et al.**
(two cases).

Nos. 10198, 10281.

United States Court of Appeals
Third Circuit.

Argued Nov. 14, 1950.

Decided March 2, 1951.

Kalodner, Circuit Judge, dissented.

710

M. H. Goldstein, Philadelphia, Pa., for appellant in 10198.

William B. Waldo, Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to Atty. Gen., Gerald A. Gleeson, U. S. Atty., Thomas J. Curtin, Asst. U. S. Atty., Philadelphia, Pa., on the brief), for appellant in 10281.

James S. Clifford, Jr., Philadelphia, Pa., (MacCoy, Evans, & Lewis, Philadelphia, Pa., on the brief), for Receiver of Aerodynamic Research Corp.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

The United States and another [1] seek to enforce a lien for taxes against Kensington Shipyard and Drydock Corporation ("Kensington") and Aerodynamic Research Corporation ("Aerodynamic").

In 1945, Aerodynamic, a District of Columbia corporation, had acquired stock control of three manufacturing concerns.[2] In acquiring those businesses, Aerodynamic had assumed and agreed to pay the liabilities of the dissolved corporations, including taxes due the United States. Pursuant to Section 311 of the Internal Revenue Code, 26 U.S.C.A. § 311, the Commissioner of Internal Revenue made a transferee assessment of $2,113,111.29 against Aerodynamic on March 31, 1947, and notices of lien were filed in the District of Columbia and Baltimore.

At approximately the same time that Aerodynamic acquired the three manufacturing concerns, it purchased from the Franklin Machine & Foundry Company the assets of a Philadelphia shipyard and ship repair business. Aerodynamic operated the Philadelphia shipyard as one of its divisions from January 26, 1945, until November 30, 1946, at which time the assets of that business were transferred to Kensington, a Pennsylvania corporation, and a wholly owned subsidiary of Aerodynamic. Both Aerodynamic and Kensington admit that this transfer constituted a fraud upon creditors of Aerodynamic. On April 2, 1947, upon learning of the fraudulent transfer, the Commissioner of Internal Revenue, by jeopardy assessment,[3] assessed against Kensington as transferee of Aerodynamic the same amount of unpaid taxes which had been assessed against Aerodynamic plus additional interest to date.[4] Notice of lien was filed the following day in Philadelphia.

On May 20, 1947, the United States began an action in the United States District Court for the District of Columbia against Aerodynamic under Section 3678 of the Internal Revenue Code, 26 U.S.C.A. § 3678, in which suit the government demanded, inter alia, the enforcement of its lien for taxes assessed against Aerodynamic, and the appointment of a receiver. The court appointed one John Lewis Smith receiver of all the property of Aerodynamic, including all the outstanding shares of Kensington. Pursuant to a supplementary order of that court, issued upon consent of the government, Smith took possession and control of Kensington and proceeded to operate it as a going concern.

The instant proceeding, entitled "Complaint for Enforcement of Lien and Appointment of an Ancillary Receiver," was

---

1. John Lewis Smith, receiver for Aerodynamic Research Corporation.

2. The three manufacturing concerns were Hall Manufacturing Company, O. K. Tool Company, Inc., and Air-track Manufacturing Corporation. These corporations were promptly dissolved and their physical assets were taken over and operated as divisions of Aerodynamic.

3. 26 U.S.C.A. § 273; 26 U.S.C.A. § 311.

4. $2,118,620.84.

initiated in the United States District Court for the Eastern District of Pennsylvania on November 26, 1947, by the United States and Smith jointly against Kensington, Aerodynamic and others [5] under Section 3678 of the Internal Revenue Code, 26 U.S.C.A. § 3678.[6] The district court in this proceeding appointed one Harold Heerman and one Joseph J. Williams permanent receivers of Kensington and ancillary receivers of Aerodynamic in Pennsylvania. The assets of Kensington subsequently were sold on order of the court below, and the lien was transferred to the resulting fund. When the receivers filed their account, the court referred the matter to a special master to audit the account and to make recommendations as to the distribution of the fund.

The two appeals now before this court are: (a) The special master, on advice of the Attorney General of the United States, recommended that the balance for distribution after payment of costs, fees, and the claims therein allowed be awarded to Smith, as receiver of Aerodynamic. The government later revoked its recommendation and filed a motion in the nature of exceptions to the master's report, in which motion it requested the court to distribute the balance to the government by payment to its Collector of Internal Revenue at Philadelphia. The government has appealed from the order of the district court denying the aforesaid motion or exceptions. (b) The special master held that the vacation pay claims of a group of employees were not entitled to priority as administrative expenses. The Industrial Union of Marine and Shipbuilding Workers of America ("Union"), on behalf of these vacation pay claimants and in its own right, has appealed from the order of the district court dismissing exceptions to the master's report.

I. Distribution of the balance.

The question in this appeal resolves itself into two basic issues: First, did the District Court for the Eastern District of Pennsylvania have discretion with respect to the disposition of the fund realized from the sale of the assets of Kensington; and, second, if the answer to that question be in the affirmative, did that court abuse its discretion?

The United States, in effect, contends that the district court had no discretion to remit the fund to Smith. Its argument is that the instant proceeding is completely independent of, and not ancillary to, the action in the District of Columbia. The reason advanced is that the United States, by making an assessment against Kensington under Section 311 [7] of the Internal Revenue Code, 26 U.S.C.A. § 311, and obtaining an immediate lien, has treated Kensington as if it were the taxpayer primarily liable; and hence, under Section 3678, 26 U.S.C.A. § 3678, the district court is obliged to order payment directly to the United States, as the holder of the outstanding lien. This, it is argued, is a logical result of the government election to proceed under Section 311 of the Internal Revenue Code, rather than to bring an equitable action to set aside the fraudulent transfer.

Section 3678(c) of the Internal Revenue Code, 26 U.S.C.A. § 3678(c), declares that the proceeds of a sale shall be distributed "according to the findings of the court in respect to the interests of the parties and of the United States." The scope, if any, of the district court's discretion is not made

5. Commonwealth of Pennsylvania, Maryland Casualty Company, and Girard Trust Company.

6. The Commonwealth of Pennsylvania, a party-defendant in the instant proceeding, moved to dismiss the complaint.

   Several months prior to the time the instant action was initiated, in August 1947, the Commonwealth of Pennsylvania had begun a suit against Kensington in the state court in which it asserted claims for taxes. Before a receiver was appointed in the state court action, however, the instant proceeding was commenced.

   The theory of the Commonwealth's motion was that the action in the state court had vested jurisdiction in that court. The motion of the Commonwealth was denied, and this court affirmed the judgment of the district court. United States v. Kensington Shipyard & Drydock Corp., 3 Cir., 1948, 169 F.2d 9.

7. See footnote 8, infra.

crystal clear by this passage; but, if it is read in the light of Section 3678(b), the meaning is· more readily perceived. Section 3678(b) provides that the court shall make parties to the proceedings all persons claiming any interest in the property. Since both Smith and the government, *inter alia,*. are necessary, or at least, proper parties, the court below must use its discretion in ascertaining what are the respective interests of Smith and the government. Certainly, Congress could easily have specified that the amount due the United States on its tax claim should be paid to the Collector of Internal Revenue in the district where the assets were sold; that it did not do so seems to us highly significant.

Since the transferee assessment against Kensington was made on the basis of Section 311 [8] of the Internal Revenue Code, 26 U.S.C.A. § 311, it is necessary to examine this section, which provides that the liability of a transferee of property of a taxpayer shall be assessed, collected, and paid in the same manner as the liability of the taxpayer. This section was first incorporated into the Internal Revenue Code by the Act of February 26, 1926, c. 27, § 280, 44 Stat. 61. Prior to that enactment, the only remedies of the government were to proceed in equity to set aside the fraudulent transfer or, if the debts of the transferor had been assumed, to bring an action at law. Phillips v. Commissioner of Internal Revenue, 1931, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289; Continental Oil Co. v.

Helvering, 1938, 69 App.D.C. 236, 100 F.2d 101, 109.

■ No new obligation was imposed upon the transferee by the statute; it merely created a new remedy in the form of a summary and expeditious method of proceeding by assessment directly against the transferee. Although, under some circumstances, for some procedural purposes, the transferee is treated as a taxpayer, the liability of the transferee is clearly secondary, not primary. Phillips-Jones Corp. v. Parmley, 1937, 302 U.S. 233, 235, 58 S.Ct. 197, 82 L.Ed. 221; Continental Oil Co. v. Helvering, supra; Harrison v. Commissioner of Internal Revenue, 5 Cir., 1949, 173 F.2d 736, 737.

To state the problem in its simplest terms, this court is faced with ·a transfer of assets by an insolvent debtor in fraud of the government's superior claim for taxes; therefore, it is in the light of the law of fraudulent conveyances that the problem should be considered.

■ At common law there were three possible remedies available to the creditor in cases of fraudulent transfers. A judgment creditor could elect to ·treat the conveyance as void and proceed to levy execution upon the property; or, in some jurisdictions, the judgment creditor could either bring an action in equity to set aside the transfer or bring a creditor's bill in equity to reach the debtor's equitable assets.[9]

Section 311 of the Internal Revenue Code,

---

8. "§ 311. Transferred assets
    "(a) Method of collection. .The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds):
    "(1) Transferees. The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law)

imposed upon the taxpayer by this chapter."

9. See discussion in Jackson v. Holbrook, 1887, 36 Minn. 494, 32 N.W. 852; also 1 Glenn on Fraudulent Conveyances §§ 65–67, §§ 70–73(a).
    All three remedies were not, ·of course, available in every jurisdiction. For example, in Pennsylvania, prior to the enactment of the Uniform Fraudulent Conveyance Act, the only remedy, in the case of real property, was to execute against the land as the property of the debtor. Then, the purchaser at the sheriff's sale (usually the judgment creditor) could maintain ejectment to establish his title. Conemaugh Iron Works Co. v. Delano Coal Co., 1929, 298 Pa. 182, 148 A. 94.

by permitting the government to make an assessment against the fraudulent transferee to the extent of the value of the assets fradulently conveyed, should be considered an efficient, modern statutory heir to the common law remedy of ignoring the transfer and executing directly against the property.

The term "ancillary" has been used throughout this case in varying ways.[10] It is true that the instant action is not ancillary to any other from a strictly jurisdictional standpoint.[11] It is also true that the district court did not fasten the title "ancillary receivers" of Kensington on Heerman and Williams.[12] Labels, however, must not be permitted to camouflage realities. In a broader sense, the instant proceeding is ancillary to the District of Columbia action. It is ancillary in the sense that it is in aid of the District of Columbia proceeding. It is ancillary in the sense that its sole object is to apply toward the satisfaction of the government's tax claim against Aero-

dynamic, assets geographically beyond the jurisdiction of the District of Columbia court. This court, in a prior appeal in this case, involving a conflict between a state receivership action and the district court receivership, has remarked: "The federal suit in the Eastern District of Pennsylvania derived directly from the original action in the District of Columbia." United States v. Kensington Shipyard and Drydock Corp., 3 Cir., 1948, 169 F.2d 9, 12.[13]

The decision of this court in Trustees System Co. of Pennsylvania v. Payne, 3 Cir. 1933, 65 F.2d 103, 107, is strong authority for the result in the case at bar. In that case, an equity receiver for a parent corporation had been appointed in Illinois. Creditors of the parent corporation petitioned another district court for the appointment of receivers for five subsidiaries, on the theory that the latter were so organized and controlled that they were mere instrumentalities of the parent corporation. The court affirmed the lower court's decree

However, under the Uniform Fraudulent Conveyance Act, 39 Purdon's Pa. Stat.Annot. § 359 (1), a creditor can either have the conveyance set aside, or disregard the transfer, and attach or levy execution upon the property.

10. See 3 Words and Phrases, pp. 390–392.

11. An action to set aside a fraudulent conveyance is ancillary to the original action from a jurisdictional standpoint. Empire Lighting Fixture Co. v. Practical Lighting Fixture Co., 2 Cir., 1927, 20 F. 2d 295, 296. It has been intimated, however, that jurisdiction in a federal district court could not be based upon jurisdiction in an original suit in another district court. Mitchell v. Maurer, 1934, 293 U. S. 237, 243, 55 S.Ct. 162, 79 L.Ed. 338; Raphael v. Trask, 1904, 194 U.S. 272, 278, 24 S.Ct. 647, 48 L.Ed. 973.

12. Although, in the complaint, the court was requested by the government and Smith to appoint Smith "ancillary receiver" of Kensington's assets, it appointed Heerman and Williams, and termed them "permanent receivers." It has already been noted that the district court also appointed Heerman and Williams ancillary receivers of Aerodynamic in Pennsylvania. Thus, although the court below did not grant the government the

exact relief requested, the court, from the very start, treated the government's action against Aerodynamic and its action against Kensington as intimately related.

13. It has already been mentioned that, until some time after the master's report was rendered. the government had always treated the Heerman and Williams receivership as ancillary to Smith's receivership. It is of interest to note that Heerman and Williams and their counsel also viewed their receivership as ancillary to Smith's. Very soon after the local receivers were appointed, a meeting was held in Washington by representatives of the two receiverships and the United States Attorney General's office, at which time certain policy decisions were made. Several months later, in February 1948, the local receivers were sorely in need of working capital. It was decided to apply to Smith in his capacity as receiver for Aerodynamic for a loan of $25,000. A meeting was arranged on February 6, 1948, for this purpose, and was attended by the local receivers and Smith, their respective counsel, and a representative of the Department of Justice. Lack of funds, however, prevented the consummation of the loan. See also footnote 12, supra.

which pierced the corporate veil by appointing receivers—in reality ancillary receivers—for the subsidiaries.[14]

█ Having decided in the instant case that the proceeding in the District Court for the Eastern District of Pennsylvania was ancillary in nature to the receivership of Aerodynamic in the District of Columbia, we are thus led directly to the conclusion that the district court had discretion to determine whether the balance of the fund realized from the sale of Kensington assets should be distributed to Smith, receiver, or to the government. See Sands v. E. S. Greely & Co., 2 Cir., 1898, 88 F. 130, 133; In re Schulte-United, 8 Cir., 1932, 59 F.2d 553, 560.[15]

We come now to the second question: Did the district court abuse its discretion in decreeing that the fund be turned over to Smith, as receiver for Aerodynamic in the District of Columbia?

The government asserts in the case at bar that, as a local lienor, it is entitled to immediate distribution from local assets, and cites as authority therefor United States v. O. K. Tool Co., D.C.Conn. 1950, 91 F.Supp. 157, wherein such distribution was made.[16] It is not necessary to pass on the validity of this contention, for the status of the United States in this proceeding is not that of a typical local lienor.

What factors should be considered by a court in deciding whether local creditors should be paid? Section 553 of the Restatement of Conflict of Laws states that a court, in the exercise of its discretion, should balance the orderly administration of the estate as a whole against the inconvenience result-

ing to creditors who have proved their claims locally.

We cannot discern any appreciable inconvenience resulting to the government by its receiving the fund via Smith, receiver of Aerodynamic. The government, unlike most creditors, possesses the rare attribute of omnipresence.

Undoubtedly, the decree of the court will aid in the orderly administration of the estate as a whole. Since the lien against Kensington is based on a transferee assessment, the amount of the lien is not an absolute sum, but is subject to reduction when funds are realized from Aerodynamic or any of the other corporations to which Aerodynamic apparently made fraudulent transfers.

Certainly the district court did not abuse its discretion in deciding that orderly administration dictated that the fund in Philadelphia and the one in the District of Columbia be consolidated and then distributed by one administration.

In so deciding, this court is not necessarily rejecting the decision of the District Court of Connecticut in United States v. O. K. Tool Co., supra. That court, in the exercise of its discretion, distributed the fund subject to its jurisdiction directly to the local Collector of Internal Revenue. The decision of this court is merely that the district judge in the instant case properly exercised his discretion in turning the fund over to Smith, receiver for Aerodynamic. The decision in the O. K. Tool case is also distinguishable in that the taxpayer therein was, realistically speaking, the original taxpayer, which had merely assumed a slightly different corporate garb.[17] In the instant

---

14. In bankruptcy cases, where both a subsidiary and a parent corporation were insolvent, and where the court deemed the separate entity of the subsidiary a mere fraudulent device, the corporate entity was disregarded, and the bankruptcy proceedings of the subsidiary were treated as ancillary to the proceedings of the parent. Stone v. Eacho, 4 Cir., 1942, 127 F.2d 284, 289.

15. See also 53 C.J. Receivers §§ 687, 688; 1 Clark on Receivers § 324 (2d Ed.); Restatement, Conflict of Laws § 553.

16. Cf. Inter Ocean Oil Co. v. Sugar Products Co., 1922, 12 Porto Rico Fed. 529, 531.

17. The O. K. Tool case arose from the same factual background as the instant case. A New York corporation, known as the O. K. Tool Co., Inc., was one of the three corporations acquired by Aerodynamic in 1945. In so acquiring the corporation and dissolving it, Aerodynamic assumed its tax liability. The O. K. Tool case discussed in this opinion was an action by the United States to foreclose a

case, however, Aerodynamic, by virtue of its acquisition of the Philadelphia shipyard, assumed no tax liability. The liability of Kensington is thus that of a transferee of a transferee, and is genuinely secondary.

II. The vacation pay claims.

■ The master found that the lien of the United States for taxes had priority over all other claims, except administrative expenses. That finding is accepted by all parties. Therefore, the claims for vacation pay can be paid only if they qualify as administrative expenses of the receivership.[18]

On August 21, 1947, Receiver Smith, then in effective control of Kensington, entered into a collective bargaining agreement, in the name of Kensington, with the Union. The effect of the agreement was, *inter alia,* to continue the vacation pay provisions of former contracts. Under these contracts, 750 hours of work in any given year was a condition precedent for the ripening of the right to a vacation or vacation pay. The special master found that Heerman and Williams adopted the collective bargaining agreement of August 21, 1947.

Numerous claims for vacation pay for 1947 were resolved by the special master in the following manner. The claims of employees who completed 750 hours of work in 1947, but who did not work for Heerman and Williams, were disallowed. These employees were deemed not to have benefited the receivership. On the other hand, those workers who completed 750 hours of work in 1947 and, in addition, worked for Heerman and Williams, were allowed vacation pay. Those payments were held to be administrative expenses on the theory that those claimants benefited the receivership.

The vacation pay claimants here on appeal contend that Smith's management of Kensington and Heerman and Williams' management constituted one receivership.

Hence, even assuming *arguendo* the validity of the law applied by the master—i. e., that only those employees who worked for the receivership are entitled to vacation pay as an administrative expense—the decision of the district court should be reversed.

The government argues that Smith's control of Kensington was completely independent of the Heerman and Williams receivership; that Smith was appointed by a completely different court; that Smith's management of Kensington was based on his possession of all of Aerodynamic's property in the District of Columbia, which included all the shares of Kensington stock. It is, however, the transferee assessment against a fraudulent transferee which is the basis of the second receivership.

We cannot accept the position of the government because it fails to face the realities of the situation. The Smith management and the Heerman and Williams management were realistically but a single legal entity superimposed on Kensington by the courts. When, on April 3, 1947, the government filed its notice of lien against Kensington, it elected to treat Kensington as a fraudulent transferee. From that date on, the government proceeded to collect its tax claim as a good huntsman relentlessly tracks down his game. This court, in an earlier appeal, made the following observation: "The government's methods in seeking to collect this sizable tax, far from resembling participation in an unseemly receivership scramble, show a succession of orderly, sound, legal moves in accordance with the statute." United States v. Kensington Shipyard and Drydock Corp., supra, 169 F.2d at page 12.

At any time after April 3, 1947, the government could have petitioned the District Court for the Eastern District of Pennsylvania to appoint a receiver to enforce its tax lien. At first, no such step was taken, and Smith was allowed to manage Kensing-

tax lien against the O. K. Tool Company, a Delaware corporation, which apparently was formed subsequent to 1945, and to which the assets formerly owned by the New York corporation seem to have been conveyed.

18. The parties have not disputed the proposition that a vacation with pay or vacation pay is, in effect, additional wages; therefore, vacation pay can qualify as administrative expenses. In re Wil-low Cafeterias, 2 Cir., 1940, 111 F.2d 429, 432.

ton through the medium of stock control. With subsequent developments, however, a local receiver became necessary. Smith had been negotiating for the sale of Kensington, but an order of the court below would have been necessary in order to convey clear title to the purchaser. In addition, the Commonwealth of Pennsylvania, seeking the appointment of a receiver, had started an action in the state court. When, on November 19, 1947, Kensington's preliminary objections to the complaint in the state action were overruled, the government decided it must move quickly. Seven days later, the instant action was commenced.

■ The public policy underlying the rule that administrative expenses of a receivership are given priority over a vested lien is that such a rule is necessary to encourage suppliers of materials and labor to extend credit to the receivership. The lienor, having elected to continue the business as a going concern, is held to have agreed to yield his privileged status.[19] Colorado Wool Marketing Ass'n v. Monaghan, 10 Cir., 1933, 66 F.2d 313, 315; 16 Fletcher, Cyclopedia of Private Corporations § 7954 (1942 revis.). Certainly this public policy would indicate that those who supplied Kensington, during the period from June 1947 to November 1947, with the labor and materials necessary for day to day operation should be equally protected.[20]

The circumstances of this case are such that a court of equity should pierce the veil of technicality and treat the two receiverships as one continuous receivership. See Trustees System Co. of Pennsylvania v. Payne, supra, and footnote 15, supra.

We believe that the decision in this appeal is a logical result of our decision in the appeal of Receiver Smith. Having decided that the assets fradulently conveyed to Kensington are assets of Aerodynamic and that the Heerman and Williams receivership was in reality ancillary to the Smith receivership of Aerodynamic, we conclude that the ancillary receivers' management is a continuation of the primary receiver's management.

■ The general proposition underlying the special master's findings of fact and conclusions of law was that all employees who were employed by a given receivership, if they otherwise qualified, were entitled to vacation pay as an administrative expense of that receivership. This general proposition was approved by the district court and is not now questioned by any party. Since we now hold that the Smith receivership and the Heerman and Williams receivership should be considered for the purpose of this case as one continuous receivership, it necessarily follows that the claims of all employees who worked 750 hours in 1947 and who were employed by the Smith-Heerman and Williams receivership, if they otherwise qualified, should have been allowed.

The decree of the district court in No. 10,281 will be affirmed.

The order of the district court in No. 10,198 will be reversed and the cause remanded for further proceedings in accordance with this opinion.

KALODNER, Circuit Judge, dissents in both cases.

19. The operation of Kensington by Smith, and later by Heerman and Williams, was undoubtedly for the benefit of the government. The order of the District of Columbia court was made with the consent of the government; the order of the court below was made at the request of the government.

20. It has been intimated by Receiver Smith and by the government that, should the vacation pay claims not be allowed here, the claimants could successfully present their claims in Washington against the Smith receivership of Aerodynamic. The reasoning of the government, however, if applied logically, would deny the vacation pay claimants the right to qualify as administrative creditors of the Smith receivership. Since the union contract was entered into between the union and Kensington (not Receiver Smith), the employees are theoretically creditors of Kensington only, and not of Smith, receiver of Aerodynamic.