## TEMMER et al. v. DENVER TRAMWAY CO. et al.

(Circuit Court of Appeals, Eighth Circuit. March 18, 1927.)

No. 7587.

1. **Carriers** ☞12(5)—**Rating base value of tramway company furnishes no proper or legal criterion on which to bottom actual value.**

Rating base value of tramway company furnishes no proper or legal criterion on which to bottom actual value, since the former is bottomed on present value of lands plus present stable cost of constructing plant, less depreciation for use, and plus a fair allowance for going value, intangible elements, and working capital.

2. **Street railroads** ☞59—**Rating base value of tramway company is not conclusive in determining solvency in deciding fairness of reorganization plan as to unsecured creditors; "value."**

In determining solvency of tramway company at time of reorganization for purpose of deciding whether provision for unsecured creditors was fair, rating base "value" determined in action to increase rate of fares is not conclusive, since actual value or fair and reasonable market value is not value taken into account in such valuation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Value.]

3. **Receivers** ☞81—**Receiver cannot, by his acts as such, pending receivership estop other parties litigant in pais.**

Receiver cannot, by his acts as such, in bringing action to increase fares of tramway company pending receivership, estop other parties litigant in pais as his very office makes him impotent to do so.

4. **Street railroads** ☞59—**Reorganized company held not precluded by rate base value from asserting insolvency during receivership as bearing on fairness to unsecured creditors.**

Action of receiver, in bringing action to increase fares of tramway company requiring the the fixing of value of property, does not preclude company after its reorganization from asserting insolvency at such time under doctrine of res judicata for purpose of determining fairness of provision for unsecured creditors, since, when proceeding was begun and prosecuted, functions and authority of old company over property were suspended and new company was not yet in existence.

5. **Judgment** ☞540—**Doctrine of res judicata is that judgment on merits by court of competent jurisdiction is conclusive.**

Doctrine of res judicata is that an existing final judgment or decree, rendered on the merits and without fraud or collusion by court of competent jurisdiction in that behalf, is conclusive of rights of parties or their privies in all actions or suits in same tribunal, or one of concurrent jurisdiction, on matters in issue.

**6. Corporations ⟨=⟩575—Provisions in reorganization plan, giving unsecured creditors preferred stock, held not inequitable or unfair.**

Provisions of plan of reorganization for unsecured creditors, granting them dollar for dollar for their claims in preferred stock of new company, *held* not inequitable or unfair, in comparison with provisions made for old stockholders and bondholders.

**7. Receivers ⟨=⟩163—Unsecured creditors held not entitled to cash accumulated during receivership because of failure to pay interest on secured debts.**

Unsecured creditors *held* not entitled to payment out of cash in hands of receiver, accumulating during receivership by reason of failure to pay interest on secured indebtedness, notwithstanding that under plan of reorganization bondholders agreed that it should go to new company as working capital, since it was in no event liable for payment of unsecured claims.

Appeal from the District Court of the United States for the District of Colorado; Robert E. Lewis, Judge.

In the matter of the foreclosure sale of the Denver Tramway Company and reorganization thereof. From a decree fixing the manner and amount of the participation of Gus Temmer and others as judgment creditors, they appeal. Affirmed.

See, also, 3 F.(2d) 285.

S. D. Crump, of Denver, Colo. (Crump & Riley, of Denver, Colo., on the brief), for appellants.

Clayton C. Dorsey, of Denver, Colo. (Gerald Hughes, of Denver, Colo., on the brief), for appellees.

Before BOOTH, Circuit Judge, and FARIS and PHILLIPS, District Judges.

FARIS, District Judge. Appellants herein appeal in the usual way from a decree of the District Court, which had the effect of fixing the manner and amount of their participation as judgment creditors of appellee, the Denver Tramway Company, upon a foreclosure sale and reorganization of said last-mentioned appellee.

This decree, in conformity with the provisions of a plan of reorganization, which was accepted and adopted by the District Court, in effect provided for general, unsecured creditors, including these judgment creditors thus:

"There are judgments and miscellaneous claims against the Denver Tramway Company, estimated not to exceed $150,000 in amount, the holders of which rank as general creditors, and such creditors shall be entitled, upon the consummation of the reorganization, to the extent that their claims shall have been allowed by the United States District Court for the District of Colorado, or shall have been approved by the joint reorganization committee, to receive preferred stock of the new company at par for the amount of their claims allowed or approved as aforesaid, but only upon the assignment of their claims to the joint reorganization committee, or its nominee, or upon the discharge of their claims in full to the satisfaction of said committee, as said committee may determine."

For the former bondholders and stockholders of the failed appellee, the Denver Tramway Company, who participated beneficially in the new company, the Denver Tramway Corporation, under the plan of reorganization, this decree in effect provided thus:

"It was proposed to the holders of the old bonds involved in the reorganization, aggregating in principal amount $12,886,700 and upon which there were arrears of interest amounting to $3,953,337, that they should accept in exchange therefor the new bonds of the new company at par, to the extent of one-half or the principal amount of the old bonds ($6,443,350), and that for the other one-half of the principal amount of said old bonds ($6,443,350) and for all arrears of interest thereon ($3,953,337) they should accept par for par new preferred stock."

"It was proposed to the old stockholders that if, and solely upon condition that, they would purchase, for each share of old stock held, one-tenth of a share of the new preferred stock paying therefor $10 in cash, or at the rate of $100 per share of new preferred stock, which was the full par value thereof, they should receive one share of the new common stock in exchange for each one share of the old stock held by them."

These several proposals (ultimately carried into the decree) were accepted by all but 3 per cent. of the bondholders of the old company, all but 3.3 per cent. of the stockholders, and all but about 30.5 per cent. of the unsecured creditors, including these appellants. Upon argument it was conceded that the provision thus made for the general, unsecured creditors is inherently, or at least proportionately, fair; that is, conceding that the appellee, the Denver Tramway Company (hereinafter called old company), was insolvent when its properties were sold and the company reorganized, and conceding that the actual value of its properties was not, when the creditors' bill was filed, in excess of the mortgagees' liens and certain priorities outstanding against these properties, the pro-

vision made by the decree for general, unsecured creditors, as compared to the provisions made for stockholders and bondholders of the old company, was not inherently unfair.

However, the basic foundations for the concession of inherent and comparable fairness are not admitted by appellants to be correct. On the contrary, the chief contentions of appellants are: (a) That the old company was never insolvent, because the actual value of its properties was at all times in excess of all its debts, both secured and unsecured, and that such fact of solvency is clearly shown by the finding and decree of the District Court, in an action brought by the receiver, pending the receivership for an increase of the rate of fares to be charged; and (b) that both the old company and its successor are conclusively bound by the value so found, by some sort of doctrine, either of estoppel or of res judicata. Another contention made by appellants is that they are entitled to be paid out of a cash accumulation of some $1,260,000, which was on hand when the property was sold, and which went presumably to the purchasers, and thus inured to the benefit of the new company.

Pending the receivership, the receiver did bring an action which resulted in a decree permitting the receiver to increase the rate of fares to be charged. The District Court, in order to fix a basis for his conclusion that the former rate of fares was confiscatory, was compelled to find the value of all of the properties of the old company, because, absent such finding, the court would not have had any proper basis on which to bottom his conclusion in that behalf. The value of the properties of the old company, thus found for the above purpose was—without setting out the figures—largely in excess of the total amount of all debts of the company, both secured and unsecured.

It is obvious that, if the value as found by the court, for the purpose of determining a fare-rating basis for a rate which would not be confiscatory, has no conclusive relation to actual value; or even if, having such relation, neither the old company nor the new company is conclusively bound by such value, appellants cannot sustain the contentions they urge upon the issue of value. If actual value, and value fixed as a basis for a fare-rating charge which will avoid confiscation, be not identical, when tested by a consideration of whether they are bottomed on the same elements, then, of course, no party to this record is bound by the value found by the court. It is, however, fairly clear, both upon reason and authority, that actual value, or fair and reasonable market value, is not the value that must be taken into account in the case of this sort of valuation. This is so largely because it has been found well-nigh impossible as a practical matter to sell the properties of a great railroad system for cash, or to sell such properties at all, except through the co-operation of stockholders and bondholders, who are induced to buy in order to obviate a sacrifice of their interests. A sale for a sum in cash, which would nearly approximate the fair and reasonable market value of the properties, could rarely if ever be made, and to take chances on a sale for cash for whatever some passer-by might see fit to offer would not only be to suffer great sacrifices of interests on the part of stockholders and bondholders of the insolvent concern, but wholly to destroy the claims of general, unsecured creditors. Therefore consideration of whether a great railroad property brought when sold under foreclosure proceedings its actual value, or its fair and reasonable market value is inevitably vain and futile, and so it has been found to be in actual and well-nigh universal practice.

[1, 2] An examination of the constituent elements which go to make up value for the purpose of determining a rate of fares to be charged in order to obviate confiscation discloses, aside from the practical difficulties of the situation, that the rating base value furnishes no proper or legal criterion on which to bottom actual value. The former, roughly speaking—according to the Supreme Court, which concludes us—is, as to physical elements, bottomed on present value of lands held, plus present stable cost of constructing the plant, less depreciation for use since construction, plus a fair allowance for going value, for intangible elements, and for working capital (McCardle v. Indianapolis Water Co., 47 S. Ct. 144, 71 L. Ed. ——, decided November 22, 1926, by United States Supreme Court, and not yet [officially] reported); the latter, in a case like this, generally and practically speaking, on what a willing buyer, under no duress to buy, ought voluntarily to pay when the seller is forced to sell—the very definitions thus disclosing the difference between such former value and actual, or fair and reasonable, market value. The specific elements which enter into the actual value of a great railroad property as a going concern are: (1) "The value of the use of such property in the operation of its railroads and its net revenue from such

use, and, (2) the current market value of its stock and bonds." Chicago, etc., Ry. Co. v. Eveland (C. C. A.) 13 F.(2d) 442. Obviously, the reference to the value of the stocks and bonds must be applied in case of insolvency and reorganization largely to the stocks and bonds of the new organization and not to those of the old and insolvent one, because the latter would not reflect any earning value, but only exchange value under the plan of reorganization. But nevertheless these differences of constituent elements illustrate the fairly clear distinction existing, between value for rate-making purposes, and fair, market, or actual value, and we think show that the former does not necessarily bear any conclusive, legal relation to the latter. Certainly, this is so, as to the matters herein up for judgment; whether it be'so in all cases and situations we need not rule. Indeed, to take any other view of it would present a fairly plain case of contradiction in terms. Practically speaking and in the light of human motives, and experience, exchange, or actual value of any commodity, except jewels, works of art, fungibles, and the like, is bottomed on what a property will produce in earnings to the owner. But rate-making value is not and cannot be bottomed on earnings. If it were, or could be, it is plain, that the more a railroad charged and earned, the more it would be entitled to charge and earn, and so, as has been said, there would arise an approximation of perpetual motion. 11 Columbia Law Review, loc. cit. 544. In passing, it may be said, that, although the District Court found that the value for rate-making purposes was largely in excess of the whole indebtedness owing, and further found that the receiver was entitled to earn on this sum annual returns of 7.5 per cent., yet the fact is disclosed by the record, that the property never actually earned in the three years it was in the receiver's hands more than an average of 4.6 per cent. annually. If as a fact it ought to have earned 7.5 per cent on its value as found by the court, but only earned 4.6 per cent., this induces an inference that the value found was not actual value, but exceeded the latter by approximately one-half of the sum found.

As said already, the proceeding to increase the rate of fares to be charged was begun and prosecuted by the receiver and not by the old company, or by any one in privity with the bondholders or stockholders. While this proceeding was, in a way, an ancillary intervention in the original creditors' bill, yet the parties to it were wholly different, so far as we are able to gather from the record, wherein the parties appear as Stenger, receiver, petitioner, against the city and county of Denver, interveners and defendants. The old company had no power to act. Though not dissolved, it could not function. Pending the receivership, to borrow a figure from another science, it was suffering from suspended animation.

[3] We think it clear—if the matter is at all directly involved, and we think it is not—that the receiver cannot, by his acts as such, estop the other parties litigant in pais. Casual reference to the office, nature, and functions of a receiver seem to make it clear that a receiver ordinarily cannot bind, conclude, or estop any party to the litigation by such acts. His very office makes him impotent to do so. Kansas City Terminal Ry. Co. v. Central Union Trust Co. (C. C. A.) 294 F. 32.

In the case last above, this court, discussing whether a receiver can by his acts in pais estop either party to the litigation, said:

"He is ordinarily neither an adversary nor a protagonist of the parties to an action, but a person indifferent between adversaries, who is appointed as the representative and arm of the court, for the equal benefit of all parties havings rights in the case. He possesses no power save such as may be given him by the court which appoints him. Davis v. Gray, 16 Wall. loc. cit. 218, 21 L. Ed. 447. In the light of such office and such limitation of functions, it is impossible to perceive any legal foundation for the contention that a receiver has the power to create a situation wherein the necessary elements of an equitable estoppel would be present."

As said already, the point of estoppel in pais is not directly involved here, and we discuss it in passing only because we find some difficulty in grasping the legal theory of the appellants.

[4, 5] If the theory of appellants be, as it seems to be, that the doctrine of res adjudicata precludes appellees from asserting insolvency, we are of opinion that this contention is not well taken. Not only was the fact of rating-base value, found by the trial court, one which could or might change almost from day to day, but the very definition of the doctrine would seem to negative appellants' contention. The doctrine of res adjudicata is that an existing final judgment or decree, rendered upon the merits and without fraud or collusion, by a court of competent jurisdiction in that behalf, is conclusive of the rights of the parties, or their privies, in all

other actions, or suits in the same tribunal, or in one of concurrent jurisdiction, on the matters in issue in the action wherein the judgment relied on was rendered. 15 R. C. L. 950. Here, as already said, none of the appellees is in privity with the receiver, who brought the proceeding for an increase of fares. When this proceeding was begun, and while it was being prosecuted, the functions and authority of the old company over its properties were suspended, and the new company had not yet come into existence.

The receiver could neither speak for them nor bind them; they neither hold through him nor under him, as already, in the definition of his office and status, has been pointed out. Whether the city and county of Denver are bound, we are not called on to rule. In saying this we are taking the record as we find it, and are considering the parties as they appear therein and not otherwise. Color is, however, lent to the view here taken, by the statement of this court that the rates fixed by the decree in the case of City and County of Denver v. Stenger were "only temporary for the purpose of the receivership." 277 F. loc. cit. 872.

[6] It can hardly be urged, as the brief of appellants does, but as counsel for appellants in his argument did not, that the provision herein made for unsecured creditors was, in comparison with the provisions made for old stockholders and bondholders, inequitable or unfair. The former got dollar for dollar of their claims in preferred stock of the new company; the latter, except the bondholders, got one share of common stock in the new company for each share of stock held by them in the old company, provided, they bought one-tenth of a share of the preferred stock of the new company and paid therefor $10 in cash, for each share of stock held by them in the old company; the bondholders got par for par, one-half share of common stock and one-half share of preferred stock in the new company for each $100 worth of bonds plus interest, held by them in the old company.

Touching the respective provisions required to be made, under a fair and proper plan of reorganization, and the discretion of the trial court in such case, the Supreme Court of the United States, in the late case of Kansas City Terminal Ry. Co. v. Central Union Trust Co., 271 U. S. at pages 453 et seq., 46 S. Ct. 551 (70 L. Ed. 1028), said:

"It now may be announced as settled doctrine, that where the value of corporate property to be sold under foreclosure is so great as to render co-operation between bondhold-ers and stockholders essential in order to secure a bidder and prevent undue sacrifice of their interests, they may enter into a fair and open arrangement to that end. But 'no such proceedings can be rightfully carried to consummation which recognize and preserve any interest in the stockholders without also recognizing and preserving the interests, not merely of the mortgagee, but of every creditor of the corporation.' * * * This doctrine is the 'fixed principle' according to which Northern Pacific Railway Co. v. Boyd ([228 U. S.] page 507 [33 S. Ct. 554, 57 L. Ed. 931]) declares the character of reorganization agreements must be determined; and to it there should be rigid adherence. But, as that opinion states, this does not require the impossible and make it necessary always to pay unsecured creditors in cash before stockholders may retain any interest whatever in the reorganized company. By way of illustration it further pointed out, that such creditors can be protected 'by the issuance, on equitable terms, of income bonds or preferred stock.' * * * But it does not follow that in every reorganization the securities offered to general creditors must be superior in rank or grade to any which stockholders may obtain. It is not impossible to accord to the creditor his superior rights in other ways. Generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them. In such or similar cases the chancellor may exercise an informed discretion concerning the practical adjustment of the several rights."

[7] Appellants contend that payment of their unsecured claims ought to have been made out of the cash in the hands of the receiver. There accumulated during the receivership some $1,260,000 of cash, which was on hand when the property was sold, and which went presumably to the purchasers. This cash was in total sum far less than the interest, which accrued on secured debts, pending the receivership; that is to say, the interest on bonds outstanding and secured by the mortgages which were foreclosed. Of course, this interest and all of it, save for the provisions of the plan of reorganization, under which in lieu of it, the bondholders took preferred stock, was the property of the bondholders, and in no event was it available to pay general, unsecured creditors. That it may and does, in the disposition made of it, indirectly inure to the benefit of the general, unsecured creditors, under the plan of

reorganization, is no argument in favor of appellants. In short, if there had not been a plan of reorganization, but an ordinary foreclosure sale, the cash in the hands of the receiver would have gone, less expenses and priorities, to the bondholders. It was their money, which the receiver was enabled to accumulate, because for some four years he was not allowed to pay interest coupons on outstanding bonds secured by mortgages on the property. Since it would have become in the case of a sale for cash the money of the bondholders, it was largely their privilege in the plan of reorganization to do with it as they saw fit. If they saw fit, as in effect they did, to agree that it should go to the new company as working capital on hand, it is difficult to see what valid complaint appellants, having no claim to it, may urge. Their contention seems to be refuted by a mere statement of it, and seems warranted neither by law, nor by consistency, because, but for the provisions of the plan of reorganization, which otherwise appellants refuse to accept, there would have been no such cash to be dealt with.

There exists but little need to discuss appellants' present insistence of the old company's initial solvency; that is to say, its solvency at or just before the time the original creditors' bill was filed. The finding of the District Court is that the old company was, at that time, not only insolvent "but about as nearly wrecked as any public concern could be." This is some of the language used by the District Court in speaking of this matter of initial solvency. In this language counsel for appellants then acquiesced. The court's finding and counsel's then acquiescence are conclusively sustained by the whole record.

The sum of appellants' numerous contentions is, in the last analysis and when expressed in the vernacular, that appellees may not, as the devil is said to have said in the legendary incident, "blow hot and cold." Conceding, arguendo, that equity in some situations frowns faintly at least, on the inconsistency to be inferred from a too tempestuous exsufflation of calidity when immediately followed by a similar exsufflation of frigidity, yet the inequities which follow if any, even when the faults are laid at the right door, are to be measured by fairly well-settled rules and not "by the length of the chancellor's foot." Measured by such settled rules, we are contrained to conclude that the decree below was correct.

It follows that the case should be and accordingly is, with costs to appellees, affirmed.