GRAND TRUNK WESTERN R. CO. et al.
v. BROWN, Auditor General of
Michigan (three cases).

Nos. 7596, 8130, 8441.

District Court, E. D. Michigan, S. D.

April 6, 1940.

Victor Spike, of Detroit, Mich., and R. C. Beckett, of Chicago, Ill., for plaintiffs.

John S. McDonald, of Grand Rapids, Mich., and Howard H. Campbell, of Detroit, Mich., for defendant.

PICARD, District Judge.

This opinion covers the above entitled cases which were, by agreement of the parties and order of the court, consolidated for trial and heard as one. They involved the value for tax assessment purposes of plaintiffs' railroads as placed by the Michigan State Tax Commission.[1] Plaintiffs herein seek injunctive relief against Vernon J. Brown, Auditor General of Michigan, restraining him from collecting any taxes in excess of an assessment base of $14,000,000 voluntarily paid by plaintiffs.

The assessments questioned are

| 1935 | 1936 | 1937 |
|---|---|---|
| $20,400,000 | $21,200,000 | $20,350,000 |

Plaintiffs allege that assessments as made are illegal for the following reasons:

First, they violate the due process clause of the Fourteenth amendment to the Constitution of the United States on the theory that valuation by said Tax Commission in each year is so greatly in excess of any reasonable valuation that it could not have been arrived at by the use of reasonable methods and honest judgment;

Second, that said assessments were arrived at by methods fundamentally erroneous or by intentional fraud;

Third, that the assessments violate the equal protection clause of the Fourteenth Amendment to the Federal Constitution in that said Tax Commission assessed plaintiffs' railroads at more than their actual true cash value and failed and refused to equalize the same in comparison with other railroads generally throughout the State of Michigan, resulting in fraudulent discrimination;

Fourth, that said assessments were violative of the commerce clause of the Federal Constitution, art. 1, § 8, cl. 3, and since said plaintiffs are public utilities engaged in interstate commerce, said assessment of taxes constitute a burden on interstate commerce.

## Four Issues Involved

As the case developed there were substantially four issues to be either agreed upon by the parties or decided by this court, three of which included mixed questions of law and fact:

First, what was the percentage of assessed valuation to true cash value used by the Tax Commission in relation to other property of the State in general;

Second, using the unit method, what percentage for each year should be applied in measuring the plaintiffs' system value within the State of Michigan;

Third, in the event this court finds that the assessments as made violate the due process, equal protection or commerce clauses of the Federal Constitution, amounting to confiscation of plaintiffs' properties, can and should this court interfere, unless plaintiffs have by their evidence proven a definite plan of fraud or discrimination; and

Fourth, what methods and factors were considered by the Tax Commission; or do results indicate that whatever methods and factors were used in arriving at the assessments, they must have been fundamentally erroneous?

### As to First Question

This court was called upon to determine first the percentage of assessed valuation to true cash value of property in general throughout the State of Michigan. A good deal of time was consumed and the parties were hopelessly at variance.

Plaintiffs claimed that while their railroads were assessed at more than their true cash value, other property in Michigan was assessed on the basis of

| 1935 at | 1936 at | 1937 at |
|---|---|---|
| 68.88% | 67.97% | 63.02% |

This was vigorously denied by defendant, who maintained that other property throughout Michigan was assessed on a basis varying from 86.53 percent in 1937 to 92.25 percent in 1936.

It is admitted that Michigan statutes require that all property in the state be assessed at its true cash value and much evidence was introduced by both parties to establish their respective claims. It appeared to this court, however, that the checking

---

[1] Michigan State Tax Commission functions as State Board of Assessors under the statute taxing railroads.

tests made by both the railroads and the Tax Commission, to prove their respective contentions by citing examples of actual exchange of properties within the several counties of the state during those years, were extremely fallible; that they were either lacking in quality or in quantity or directed towards ultimate presentation of evidence in a court of law to substantiate their respective positions. As a consequence, each party apparently put forth its best data. In the final analysis the so-called actual instances of real estate transfers were not of great aid to us except to emphasize the existence of an objective to which the Tax Commission might well direct its attention. I refer to the inequities between assessed value of property within urban centers where city assessors of Michigan are making a valiant attempt to live up to the letter and spirit of the law and certain other types or classes of properties within this state. The undisputed evidence proved that while the city property owner pays on an assessed valuation equal to 92 to 95 percent of the cash value of his fee, in other parts of Michigan that ratio runs as low as 40 percent. In the case at bar, we found it necessary to make a determination taking into consideration the weaknesses in the findings of the respective parties and decided that the ratio of the assessed valuation of property generally, throughout the State of Michigan, to the true cash value of that property, was

| In 1935 | In 1936 | In 1937 |
|---------|---------|---------|
| 79.08%  | 80.11%  | 74.78%  |

These percentages, which we believed fairly and equitably recorded the situation, were accepted without protest by the litigants and we then proceeded to the other issues involved.

### As to the Second Question

The allocation factors to be applied in measuring the plaintiffs' system within the State of Michigan were amicably adjusted. It was first agreed that the "unit" method of taxation should be the base—that is, the value of the entire railroad system, whether located in Michigan or elsewhere, should be determined and that then that portion within the state be allocated for assessment. The percentage of the value of the railroads' properties within Michigan's borders, as finally agreed upon, was

| In 1935 | In 1936 | In 1937 |
|---------|---------|---------|
| 56.62%  | 56.63%  | 56.66%  |

### As to the Third Question

We come then to the third question, which is fundamental, and now necessary for this court to determine unless we are prepared to find that some sort of Machiavellian scheme on the part of the Tax Commission to destroy plaintiffs through taxation was perpetrated. In short, what authority has this court to interfere with the quasi judicial findings of a state tax board under any circumstances, short of a definite and fixed plan of fraud against plaintiffs' properties?

And this court, acknowledging all presumptions in favor of the assessment as made, nevertheless believes it still has a right and a duty in connection therewith and accordingly some measure of control over final disposition of plaintiffs' causes of action, provided we find what amounts to "constructive fraud". The authority for this statement is found in the citation advanced as "controlling" by both parties, to-wit, City of Detroit v. Detroit & Canada Tunnel Co., 6 Cir., 92 F.2d 833, 836, first decided by one of our associate judges in this district and confirmed in essence by our own Sixth Circuit Court of Appeals. It was there held: "It is clear that if the assessments made by the taxing authorities were so grossly excessive as to be unreasonable, and were arrived at by the adoption of fundamentally wrong principles, they were not final and a federal court of equity has power to grant relief because taxation based upon such valuations deprives the Company of its property and denies it the equal protection of the law".

This is followed by a long line of decisions (92 F.2d at page 836) which to repeat here would be superfluous. See also Christiansen v. Hilber, 282 Mich. 403. 276 N.W. 495, and cases quoted therein; S. S. Kresge v. City of Detroit, 276 Mich. 565, 268 N.W. 740, 107 A.L.R. 1258.

It therefore is incumbent upon this court to determine whether the assessments were "grossly excessive as to be unreasonable" and whether they were arrived at "by the adoption of fundamentally wrong principles", and if so, to act accordingly.

### As to the Fourth Question

This brings us to the fourth and final issue to discuss. Preliminary thereto, however, it is essential to make certain findings upon which we must determine if the

assessments were so grossly excessive as to be unreasonable and must they have been arrived at by the use of fundamentally wrong principles?

## Findings of Fact
### (a) *In Re Claims of the State.*

It is admitted that the Tax Commission did not divulge the exact method or principles used in arriving at its results. However, it did through its chairman indicate that it has since applied a test based upon the chief contributing factors it did consider, which method it claims to be fair and equitable and within the purview of the Tax Commission's functioning as a taxing authority.

The test is as follows:

(1) It capitalized the plaintiffs' net railway operating income at 6 percent for a period of 10 years.

| 1935 at | 1936 at | | 1937 at |
|---|---|---|---|
| $44,636,450 | $39,443,550 | and | $32,994,300 |

(2) It then placed the net stock and bond values for

| 1935 at | 1936 at | 1937 at |
|---|---|---|
| $51,244,068 | $62,093,984 | $52,449,521 |

(3) Third, it took the cost of reproduction less depreciation and arbitrarily eliminated therefrom some 500 miles of railroad that carried less than 2,000,000 ton miles of freight annually and arrived at the following result for

| 1935 at | 1936 at | 1937 at |
|---|---|---|
| $66,460,600 | $67,228,017 | $68,863,770 |

and

(4) Finally, it then gave a one third weight to each of the above factors and arrived at the system value in each of the three years as follows:

| Entire System | | Percentage in Michigan | | Michigan Values |
|---|---|---|---|---|
| In 1935 $54,113,706 | at | 56.62 | equals | $30,639,180; |
| In 1936 $56,255,183 | at | 56.63 | equals | $31,857,310 and |
| In 1937 $51,435,863 | at | 56.66 | equals | $29,143,560 |

The above represents the full cash value of plaintiffs' railroads in Michigan (excluding D. G. H. & M. not involved in this litigation) as claimed by the Tax Commission for the respective years, and the actual assessment was reached by defendant in each year by an arbitrary ratio of assessment to value, as follows:

In 1935, full value $30,639,180, multiplied by 66.58%, equals $20,400,000;

In 1936, full value $31,857,310, multiplied by 66.55%, equals $21,200,000; and

In 1937, full value $29,143,560, multiplied by 69.83%, equals $20,350,000.

Attention is here directed to the fact that if defendant's assessments are correct, the percentages used by it each year being less than the figure determined by the court as the ratio of the percentage of assessment to actual cash value of other property throughout Michigan, any computation on defendant's "full value of properties in Michigan", using the court's percentages, would bring a greater assessment against plaintiffs than was actually made. But of course, defendant is not striving for any such contention here.

### (b) *In Re Railroads' Claim*

Passing to the claim of plaintiffs, we find that although paying on a value base of $14,000,000, at the trial, in arriving at what they claim should be the proper assessment, plaintiffs used two methods of computation:

First, that of Dr. Badger, which was a combination of stock and bond values coupled with capitalized earnings on net railway operating income; and

Second, Dr. Martin's plan, a combination of capitalized earnings on the same net railway operating income plus an average on gross income.

Neither Dr. Badger nor Dr. Martin gave any weight to cost of reproduction less depreciation, and Dr. Martin not only eliminated this element but also failed to consider stock and bond values.

In Dr. Badger's method, no value was placed upon either the common or preferred stock in plaintiffs' opening brief, but in their reply brief they added the value of both common and preferred stocks to Dr. Badger's analysis exactly as originally reported by plaintiffs to the Tax Commission and as found in the record on page 1547.

This then was the railroad system value as determined by plaintiffs on Dr. Badger's suggestion.

First, they capitalized the railroads' net railway operating income at 6 percent as follows:

For 1935, $17,465,000 (3 year average at 6 percent);

For 1936, $25,525,000 (4 year average at 6 percent) and

For 1937, $27,141,000 (5 year average at 6 percent).

Second, they added to this the stock and bond values (as corrected[2]) which are for

| 1935 | 1936 | 1937 |
|---|---|---|
| $35,767,500 | $40,455,500 | $38,416,000 |

Dr. Badger then gave a 50 percent weight to each of the above factors and arrived at the system value in each of the three years as follows:

| | System Value | | Percentage in Michigan | Equalized at | Assessment |
|---|---|---|---|---|---|
| 1935 | $26,616,250 | at | 56.62% | 79.08% | $11,917,450 |
| 1936 | $32,990,250 | at | 56.63% | 80.11% | $14,966,461 |
| 1937 | $32,778,000 | at | 56.66% | 74.78% | $13,888,253 |

In arriving at his solution of the system value, Dr. Martin used the following:

All of these figures, of course, were very interesting, but the mere showing that one's neighbor or competitor has had his assessment reduced or the value placed upon his property cut down, when compared to one's own property, is not of itself sufficient to prove discrimination. There are too many other elements entering into the controversy and there may have been any number of reasons why these apparent discriminations appeared.

The fact remains that discrimination was alleged by plaintiffs, and this court finds as a matter of fact that plaintiffs have failed completely to prove any discrimination upon which this court could preface

1935 $25,252,546 { Three year average gross income 33⅓% weight } and { Three year average net railway operating income at 6% 66⅔% weight }

1936 $28,963,918 { Four year average gross income 20% weight } and { Four year average net railway operating income at 6% 80% weight }

1937 $27,140,217 { Five year average net railway operating income at 6% 100% weight }

The above are, of course, subject to the ratio of plaintiffs' properties within the State of Michigan and equalization percentages for the respective years.

### Further Findings

It will be noted that in the pleadings there are numerous allegations of discrimination between railroads in Michigan to detriment of plaintiffs, and in plaintiffs' original brief on pages 6 and 7, there are voluminous figures presented to prove that while plaintiffs' assessments increased from 1919 to 1929 some 66.81 percent, the increase for all railroads in Michigan during the same period was only 34.25 percent. Plaintiffs allege that these discriminations continued each year and, though small, had nevertheless an accumulative effect over a period of time that substantially placed plaintiffs' assessments out of line with other railroads. Grievances of plaintiffs were particularly aimed at the New York Central, Pennsylvania and Pere Marquette, which, together with plaintiffs, constitute over 77 percent of all railroads taxable in Michigan. There was also comparison of net railway operating incomes of these roads during two seven-year periods, the second terminating in 1937 and the corresponding reduction in assessments which each received.

a finding of either actual or constructive fraud.

This court further finds that there is no evidence of any attempt on the part of the taxing authorities to persecute plaintiffs through taxation and that there was no evidence of actual fraud in fixing the respective values.

### Conclusions of Law

Necessarily in a matter involving so many cross currents of statistics as an action of this nature, findings of fact will intrude upon conclusions of law. But this is the result of an effort to avoid repetition and because simultaneous discussion of the facts and the law seem to follow in natural sequence.

It is admitted that the State Tax Commission did not produce evidence to indicate just how it reached its conclusions, but it has been held many times that the method or formula resorted to by taxing authorities in arriving at their "result" is not of controlling importance.

"If the result arrived at was clearly within the permissible limits of their discretion, the particular method used would seem unimportant. If the result was clearly wrong, the method used would not save it." Bailey v. Megan, 8 Cir., 102 F.2d 651, 654.

[2] Without any valuation placed on plaintiffs' stocks the assessment claimed by plaintiffs would have been

| In 1935 | in 1936 | in 1937 |
|---|---|---|
| $9,100,000 | $9,100,000 | $8,400,000 |

See also Great Northern Ry. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532; City of Detroit et al v. Detroit & Canada Tunnel Co., 6 Cir., 92 F.2d 833.

The taxing powers of the Tax Commission over railroads in this state are found in Section 3552 and subsequent sections of the Michigan C.L. of 1929. The law provides for an ad valorem tax "of the property" of "railroad companies", based upon an assessment, "at the true cash value" (Section 3560, C.L.1929). See Constitution of Michigan (Art. X, Sections 5 and 7)

Section 3415, C.L.1929, defines "true cash value" to be "the usual selling price at the place where the property to which the term as applied shall be at the time of the assessment, being the price which could be obtained therefor at private sale, and not at forced or auction sale."

The tax is upon the railroad as an enterprise and the assessments are made in April of each year for the prior year ending December 31. There is an opportunity then given the railroad to appear for hearing and final assessment follows. Section 3562, C.L.1929. No particular formula or method or plan of assessment is laid down. The statute merely requires that the Tax Commission make "the assessment or valuation of the property of such company in such manner as will, in its judgment, make the valuation thereof just and equal."

■ At the out-set also this court finds as a matter of law, that the action of the state taxing authorities is surrounded by all of those presumptions which safeguard official action from unwarranted attack and places upon its assailant the burden of proving his assertions, the presumption being that the Tax Commission has acted in its discretion and within its authority. Bailey v. Megan, 8 Cir., 102 F.2d 651; Great Northern R. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532; Rowley v. Chicago & N. W. R. Co., 293 U.S. 102, 55 S.Ct. 55, 79 L.Ed. 222.

■ Therefore even though plaintiffs, as claimed herein, did develop statistics indicating that other railroads have received greater deductions in their assessments pro rata over a period of years, in truth, railroads with greater earning power compared to plaintiffs, there was no shifting of the burden of proof requiring the Tax Commission to justify its own decision. Northern Pac. R. Co. v. Adams County, D.C., 1 F.Supp. 163.

## The Real Issue

Were Erroneous Principles Used Resulting in Grossly Excessive and Unreasonable Assessments of *Plaintiffs' Railroads?*

It must be remembered that although there was no evidence as to what method the state actually did use, defendant submitted to this court a test heretofore itemized in detail herein (32 F.Supp. 788), the use of which by the Tax Commission, when applied to valuation reached each year, it claimed justified that assessment.

In addition it must also be noted that defendant couldn't have used the same methods throughout the three years because, if it had, there would have been a great disparity between the year 1935 and 1937. Undoubtedly the Tax Commission's measuring stick each year had to be adapted by it to the result it already had. The consequence is that defendant justified its final figures reached by a formula for which there is seemingly no authority in law or in equity and so far as the ratio of assessment to true value is concerned, is even below that contended for by plaintiffs. In other words, it wasn't the way the Tax Commission reached the assessment that they were showing this court—the test was to indicate in general the factors considered, the weight given and how equitably and fairly defendant had treated plaintiffs in arriving at the assessments as made.

Passing then to the railroads we find the same situation to be true because how they reached their $14,000,000 figure for each year is not discernible from the testimony and no matter which of plaintiffs' theories one applies—that of Dr. Badger or Dr. Martin—no assessment computation of plaintiffs arrives at $14,000,000. The sum is down as low as $8,400,000 and only one year reached $14,966,461. As for the method and factors used by the railroads and sought to be justified by them, the difference between them and defendant terminates in an unjumpable gap, for—

(a) The railroads gave absolutely no weight to tangible assets as evidenced by cost of reproduction less depreciation;

(b) They gave a 50 percent weight in Dr. Badger's analysis to capitalized earnings (net railway operating income) covering three, four and five year periods respectively for 1935, 1936 and 1937, while the state used 10 years; and

(c) Dr. Badger gave a 50 percent weight of valuation to plaintiffs' stocks and bonds.

Dr. Martin's computation substitutes a certain value on "gross income" in lieu of stocks and bonds. 32 F.Supp. 789.

■ This court finds as a matter of law that in the instances hereinlater specified, both parties used excessive valuations and neither party used an acceptable combination of factors with percentages thereof. We arrive at this conclusion again from the chief authorities submitted by both parties and we find

(a) No basis for a "test" such as has been used by defendant where a one-third weight is given to reproduction less depreciation, nor

(b) Of a method that would forbid use of reproduction less depreciation as claimed by the railroads.

Nor do we find the decisions as far apart as might be supposed from the respective theories. They can be harmonized; and although some courts have considered capitalized earnings plus value of stocks and bonds as sole factors, those same courts have consistently either directly or by implication indicated that an assessment reached by consideration of these two quotients plus cost of reproduction less depreciation will not be disturbed. Atchison, T. & S. F. R. Co. v. Collins et al., 294 F. 742; Great Northern Railway Co. v. Weeks, supra. This is particularly true where the ratio of percentage does not place too much stress upon the latter factor. Northern Pacific R. Co. v. Adams County, supra.

Admittedly in City of Detroit v. Detroit & Canada Tunnel Co., supra, the capitalization of net income method of valuation for tax purposes was used exclusively. But note the court's words on page 837 of that decision: "The capitalization of net income method of valuation for tax purposes of such similar utilities as ferries, bridges, canals, toll roads, and pipe lines *is not unusual.*" (Italics ours.)

It is significant that the court does not include "railroads", and this is further emphasized on page 838 of 92 F.2d in the same opinion when the court opens the door for further consideration of its problem by the taxing authorities and goes on to say: "It is also conceivable that the land and buildings valued purely as real estate for business purposes apart from the tunnel might well have an actual true cash value higher than the capitalized earning value of the entire property. These are but elements of the controversy which the taxing authorities could and should consider and which are foreclosed to them under the present form of the decree."

In the Tunnel case the City of Detroit refused to consider anything other than cost less depreciation. This the court held constituted error in a statistical background which brought the taxes as assessed to 41 percent of the gross earnings. But it does not say that assessing bodies cannot or should not consider tangibles other than stocks and bonds. As a matter of fact, as above inferred, it invites just such action. See Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819.

In Northern Pacific R. Co. v. Adams County, supra [1 F.Supp. 175], the court stated that reproduction cost less depreciation may be considered in "valuing railroad property for taxation, but in this field it is a far less influential factor than it is in the process of fixing a rate base."

See also Chicago & Northwestern Railway Co. v. Eveland, 8 Cir., 13 F.2d 442.

In Bailey v. Megan, supra, the court held that in estimating the value of a railroad or any part of it "taxing authorities were entitled to take into account whatever considerations might reasonably be given weight by private parties in the fixing of a price in fair negotiations for the purchase and sale of the property".

In Great Northern R. Co. v. Weeks, supra, the court said [297 U.S. 135, 56 S.Ct. 428, 80 L.Ed. 532]: "The full and true value of the property is the amount that the owner would be entitled to receive as just compensation upon a taking of that property by the state or the United States in the exertion of the power of eminent domain. That value is the equivalent of the property, in money paid at the time of the taking. Olson v. United States, 292 U.S. 246, 254, 54 S.Ct. 704, 78 L.Ed. 1236. The principles governing the ascertainment of value for the purposes of taxation are the same as those that control in condemnation cases, confiscation cases, and generally in controversies involving the ascertainment of just compensation. West v. C. & P. Telephone Co., 295 U.S. 662, 671, 55 S.Ct. 894, 79 L.Ed. 1640."

It then goes on to say: "In determining the amount of the assessment, the board was not bound by any formula, rule, or method, but for guidance to right judgment it was free to consider all pertinent facts,

792

estimates, and forecasts and to give to them such weight as reasonably they might be deemed to have."

· And on page 142 of that case in 297 U. S., 56 S.Ct. on page 430, 80 L.Ed. 532, the court approves of the method used by the Tax Commissioner of North Dakota, who included in his consideration

"(1) Miles of all track,

"(2) physical property,

"(3) car and locomotive miles,

"(4) ton and passenger miles, [and]

"(5) gross earnings."

In our case the fallacy of the railroads lies in their refusal to consider, or permit the Tax Commission to consider, physical values at all; the error of defendant lies in the weight given that physical valuation; while in the opinion of this court the figures used by both parties as factors themselves are subject to revision. Furthermore, we are convinced that there is no cut and dried formula that the Tax Commission is obliged to follow, nor is there any percentage it must use. The question lies solely in the result, which must not culminate in gross injustice or over-assessment.

Appreciating that each method is subject to some attack, we proceed to discuss the elements that were debated by the Tax Commission, admitting and enumerating some of their weaknesses and applying the criterion to the case at bar.

### Capitalized Earnings

When we use the term "capitalized earnings" under the decisions we mean "the value upon which the earnings of the property through" a certain period "would yield a rate of return which would be adequate to attract capital". Northern Pac. R. Co. v. Adams County, supra. And when we use the term "six percent", we in truth and in fact revert to a time in our economic history when only a gilt-edged investment at six percent would attract capital. But that is not the fact today. Banks and other loan institutions, including the R. F. C., are making and have made any number of loans to railroads at a much lower rate, even down to four percent. In truth, during the past few years including 1935, 36 and 37 an investment that would pay four percent was not to be entirely ignored.

There have been times, of course, that safe money made seven percent, but to begin with we are confronted with the status

as it is today and not as it was when tax assessments were originally questioned in our courts. Logically, then, this court feels that the use of six percent instead of five or four percent is still debatable and there is therefore a "weakness" in the six percent basis that might have been questioned. Then, too, when we select capitalization on earnings as a method, we are faced with the "time" period of earnings as well as the "rate" and this is not easy to determine. The earnings factor assumes that there has been a competent and economical management of the business and that there is no exceptional value to the owners of the particular business to be taxed.

Let us pause here to apply this latter thought to the case at bar, bearing in mind that most of the bonds and all stocks of the plaintiffs are owned by the Canadian National Railways and that the evidence indicates that there may be a particular bookkeeping advantage running to Canadian National through that ownership. Although not enlarged upon at the trial, we believe it will not be denied, for example, that Canadian National is able to maintain its equipment in repair and use more economically because of its ownership of the Grand Trunk. It is able also, through leases, to maintain a market for its rolling stock at a figure that is more than the Grand Trunk as a separate road might be required to pay. Being located in two countries, the Canadian National Railways via its Grand Trunk affiliation finds itself in a position where through book-keeping it may take advantage of its earnings—not only for tax assessment purposes, in both countries, but for rate making purposes. Yet we do not even intimate that this is illegal nor that the right has been abused by plaintiffs. Nevertheless, it is well for the parties to note that advantages to the particular owner of this railroad (which might well tend to minimize the importance to be given to its net railway operating income) have not entirely escaped notice of this court.

It must also be evident to even the most uninitiated that if a railroad over a five-year period finds itself in the red with practically no value to its stocks and bonds, that then under theory of plaintiffs, it shouldn't be taxed at all. On the other hand, a five million dollar net railway operating income averaged over five years. (plaintiffs had $7,191,826 in 1928 and $6,-385,843 in 1929) would give the railroad.

capitalized at six percent, a value of over $80,000,000—a result most ridiculous when considered for taxation purposes. This then is a weakness in the capitalized earnings method.

■ As for the period to be considered: Here we believe there is some force to arguments advanced by plaintiffs. Offhand one would think that the years 1926 through 1929, being of high prosperity and high earnings for the Grand Trunk, would be fairly off-set by depression's 1930, 31, 32 and 33. But a close scrutiny of the statistics does not sustain this view, since defendant's own figures show the capitalized earnings base to be less in 1936 and again less in 1937 when earnings and net railway operating incomes for those two years were greater. So if we are to be guided solely by the principle that earnings and the value of stocks and bonds is the only plan to follow, we apparently reach an inconsistent position in adopting a ten year coverage, for which, furthermore, there is seemingly no authority in the decisions.

■ Let us develop further our objection to the 10 year period and take judicial notice that since the depression there has been an evolution and change in our economic system, particularly in methods of transportation. We must recognize this fact. The use of trucks has increased greatly and we may never return to that era in the history of railroads where their uses for freight and general transportation purposes may be as dominant as they were in the years preceding the depression. Atchison Topeka & Santa Fe Railway Co. et al. v. United States et al., 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273.

All things considered, therefore, this court feels that the three, four and five year periods used by plaintiffs are fairer than the ten years used by defendant. They are more consistent with the time and although open to some criticism, as above indicated, and apparently giving some advantage to the railroads, we believe that plaintiffs' failure to consider the years 1931, 32 in their computation, when there was a deficit and no net railway operating income, off-sets to some extent any advantage on the "time" element the railroads might have.

Our conclusion is that the figures reached by defendant for this factor were erroneous and contributed to gross over-valuation and we therefore adopt the earnings as advocated by plaintiffs.

### As to Stocks and Bonds

Both parties used the stock and bond method in their computations, but there is a yawning chasm between their respective values. In any event, this method has likewise been open to many just criticisms by the courts.

Surveying this factor the court in Northern Pac. R. Co. v. Adams County, supra, states: "It requires the fixing of a period over which the market quotations shall be averaged, and this of necessity must be a more or less arbitrarily fixed period of time; it assumes that the average value of the stock and bonds actually sold reflects the value of the entire outstanding issues of each, when rarely ever is the controlling interest in stock and bonds of a railroad company bought or sold on the stock exchange, and, where control or ownership of a corporation is sought, it is common knowledge that the securities sharply advance in price; it assumes that the aggregate market value of the stock and bonds issued by a corporation is the same as the market value of the property owned by the corporation and which underlies the securities; it presupposes an idealistic knowledge and state of mind on the part of those who deal in such securities on the stock exchange, in that it assumes that the purchasers of the securities act upon an informed judgment based upon accurate information as to the character and extent of the assets of the corporation whose securities are involved; and it largely ignores the influence of pure speculation in the market on the part of those who do not even pretend to possess accurate information with respect to the assets and affairs of the corporation whose securities are bought and sold. As was aptly said recently in a public address by a distinguished executive of a large life insurance company: 'What is the Stock Exchange? It is merely a place where public auctions are held. It differs from other auctions only in the articles sold, and in the volume of the transactions. It is no more true of this auction than of other auctions, that the prices bid are an infallible index of the real value of the articles dealt in. The quotations fluctuate with the optimism or the pessimism of the bidders. They are frequently much better evidence as to the bank accounts and credit of the bidders than of the value of the stocks bought and sold' ".

In the case at bar the relative stock and bond values placed by the parties are:

| State | | Railroads (Original) | |
|---|---|---|---|
| In 1935 | $51,244,068 | 1935 | $30,720,000 |
| 1936 | $62,093,984 | 1936 | $31,208,000 and |
| 1937 | $52,449,521 | 1937 | $30,541,000 |

As noted, the railroads, in their opening brief, used the above, but in their closing brief added a value to the stock, in accordance with representations which they had made before this very Tax Commission on the occasion of the original hearings when they were first protesting the assessment. Corrected by plaintiffs the stock and bond values of the railroads are:

| For 1935 | For 1936 | | For 1937 |
|---|---|---|---|
| $35,767,500; | $40,455,500 | and | $38,416,000 |

This concession, in the opinion of the court, is significant. In arriving at the value of stocks and bonds, these parties are in accord in some instances, except the junior mortgage of $31,947,000 wholly owned by the Canadian National Railways. The railroads at the hearing before this court put a value on that issue for 1935 at $7,986,750 and for 1936 and 1937 at $9,584,-100. On the other hand, the state placed a value on the junior mortgage of $21,832,-580 in 1935; $22,372,484 in 1936; and $22,-832,521 in 1937.

It must be apparent that when the railroads conceded that this court could rightly take into consideration value of the stocks as represented by it to the State Tax Commission at the original hearings, this court could also assume that this admission necessarily added to the value of the bonds, which are prior to and must be paid before either the preferred or common stock can be given any value at all. In addition this court, in reviewing pleadings and the testimony, came across other very pertinent facts which were before the Tax Commission at the time these taxes were under discussion originally.

We found that in the 1935 bill of complaint (plaintiffs' exhibit 2 page 63), in the 1936 bill of complaint (plaintiffs' exhibit 2 page 67), and in the 1937 bill of complaint (plaintiffs' exhibit 3, page 85), plaintiffs themselves placed a value on these very same bonds covered by the "junior mortgage" as follows:

| In 1935 | In 1936 | | In 1937 |
|---|---|---|---|
| $13,417,740; | $17,778,506 | and | $21,548,251 |

■ Granting that the testimony and methods of computation used by defendant in its stocks and bonds were not entitled to great consideration and evidently not in compliance with recognized rules of valuation as used by the experts, would not this Tax Commission have been justified in using the stock and bond values originally submitted by plaintiffs to it—not those juggled by experts to meet exigencies and emergencies and to justify a lower tax computation to submit to this court? We believe the values placed by plaintiffs on their own stocks and bonds—when a law suit was not in the offing—are much more dependable than that reached by experts in anticipation of a trial and that those values did plaintiffs no injustice.

Therefore because both computations at the trial are undoubtedly erroneous, and since the Commission had figures before it at the hearings which it did not then question, this court, bearing in mind the presumption of due consideration by the taxing authorities of "all pertinent facts, estimates and forecasts" (supra), elects to accept as a basis for computation of the net stock and bond values those estimates as originally submitted to the Tax Commission by plaintiffs themselves for the years in question. Add to this the value of the debt to the State of Michigan, capitalized rentals, non-negotiable debt, all as testified by Dr. Badger and not in dispute, we find those values to be:

| In 1935 | In 1936 | | In 1937 |
|---|---|---|---|
| $42,046,075; | $52,728,213 | and | $53,302,256 |

And in passing, may we not make comment that if the stock and bond computation of the state is of little value, surely plaintiffs cannot object if the figures used, are those submitted to the taxing board prior to litigation.

### Values for Taxation Versus Values for Rate Making

■ We desire at this point to mention in passing another consideration which perhaps may later be taken care of by legislation. This court became initiated in this action into what is apparently the accepted fact that a railroad may have one "full and true value" for tax purposes and another for rate-making purposes. It is stated in Northern Pac. R. Co. v. Adams County, supra: "In valuing a railroad for taxation, the value of the utility is the thing sought, whereas, in valuing a railroad for rate-making purposes, the objective is a value on which the railroad is entitled to earn a fair return, if it can." Cleveland, C.

& St. L. Railway Co. v. Backus, 154 U.S. 439, 14 S.Ct. 1122, 38 L.Ed. 1041; Temmer v. Denver Tramway Co., 10 Cir., 18 F.2d 226; Minnesota Rate Cases, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18; Harris Trust & Savings Bank v. Earl, 8 Cir., 26 F.2d 617; State of Missouri v. Public Service Commission, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807; Atlanta, Birmingham & Coast Railroad Co. v. United States, 296 U.S. 33, 56 S.Ct. 12, 80 L.Ed. 25.

However, in Atchison, T. & S. F. R. Co. v. Collins, D.C., 294 F. 742, 749, the court states: "It is commonly recognized that no one of the methods (stocks and bonds, capitalization of net earnings and reproduction less depreciation), standing alone, gives assurance of a dependable result, and that it is safer to take the composite view resulting from a consideration and application of all of them. * * * The objection is, not that such appraisal (reproduction less depreciation method) is inaccurate or untrustworthy, but that it was made for rate-making purposes rather than for taxation purposes, and that therefore it is incompetent for use in these suits. I am aware that in certain quarters a wide difference of view exists touching this general question. While I am not of the opinion that properly there can be but one valuation, in the long run valuation for rate-making purposes and valuation for taxation purposes should closely approximate each other. There are common factors, and necessarily there is a measure of interdependence. True, by statutory definition and declaration, the two may be entirely segregated, but such segregation would be artificial. It is further true that without the statutory definition (no statute in Michigan), and where the effort is to ascertain a fair value for rate-making purposes and a fair value for taxation purposes, cases may and often do arise where there are differentiating considerations. If the railroads could always make a fair net return upon the fair valuation established for rate-making purposes, and only a fair return, I see no reason why, generally speaking, the fair valuation for such purpose should not also be taken as a fair valuation for taxation purposes. However that may be, considerations of public policy strongly argue for a constant endeavor to keep the two valuations close together." (Parentheses ours)

This court repeats that having become initiated into what is seemingly good law, to-wit, a difference between value for rate purposes and value for tax purposes must follow those decisions until our Court of Appeals speaks further. Nevertheless, we find ourselves more in sympathy with the co-ordination of such values and can see no real grounds for such distinction. Values should be approximately the same for all purposes—at least no unexplainable variances.

### As to Physical Values

■ Proceeding, however, to the physical values herein: We believe that this court follows the trend of decisions when it determines that physical values not only might be and were considered by the Tax Commission, but rightly should have been. (Citations heretofore given.) We too, like the court in Northern Pac. R. Co. v. Adams County, supra—"[are] more concerned with the holdings of the courts than with the theories of economists or the reasoning of logicians", and we can find no decisions cited by either party where the findings of an assessment board were set aside because physical valuations were considered as part of the formula. We have heretofore cited our own Circuit Court of Appeals (Tunnel case, supra). Obviously there is a distinction between physical values of property used in operating a tunnel under a river and a railroad. With the possible exception of the lands and buildings at each end, comparatively little of the tunnel can be saved for other purposes. It is a one purpose utility. We are not engineers, but certainly the cost of salvaging the same would be considerable, if not more than results warranted. On the other hand, a railroad has not only salvaging characteristics, but there are rights of way; there are warehouses; there are sites; there are depots and, in some instances, office buildings, to say nothing of tracks and rolling stock that might be used on other operating roads.

In this particular case, the physical value of plaintiffs' entire system, based upon the reports submitted by it to the Interstate Commerce Commission and the Bureau of Valuation, being cost of reproduction less depreciation, were as follows:

| In 1935 | In 1936 | | In 1937 |
|---|---|---|---|
| $90,630,219 | $92,206,311 | and | $93,657,379 |

These figures are a matter of computation only, following appraisal, all of which is done by competent men, experts in their lines. The Bureau of Valuation is an inde-

796

pendent group of specialists. Here the only testimony we have on physical values is given by defendant in which it is claimed that obsolescence, out-moding, average life and material depreciation of all equipment were taken into account and at the trial were not seriously questioned by plaintiffs. This court has accepted those figures as being before the Tax Commission and such as could have been and were used by it in arriving at its results.

## Weight to be Given

■ What weight therefore should be given to each of the above factors, bearing in mind the decisions of the courts, and the predominant weight to be given earnings and stocks and bonds? Cincinnati Southern Ry. v. Guenther, C.C., 19 F. 395, 400. Surely not one-third—even eliminating 500 miles of railroad. On this point we would be almost obligated to apply as a minimum the ratio used by the courts in part in the Adams County and Megan cases, supra, to-wit:

40 percent for capitalized earnings;

.40 percent for stocks and bonds; and

20 percent for physical values (reproduction less depreciation)

were it not for the fact that in this particular case there is another element.

■ In arriving at the value of the railroads, it was agreed between all parties that the unit rule should be used; that is that the percentage of the railroad operating in Michigan, together with the value of that property, should be set apart from the rest and those percentages heretofore referred to and agreed upon were:

| In 1935 | In 1936 | In 1937 |
|---------|---------|---------|
| 56.62 | 56.63 | 56.66 |

while the "all track" method of computation was the base. In other words, if a distance between two points was 50 miles and there was one track connecting the two, that would be called 50 miles of track, but if there were two sets of tracks, or even three, the distance would be multiplied by the number of sets to arrive at the trackage. In the entire Grand Trunk system there are 2,223.61 miles of track and of this amount 1,404, or almost two-thirds, are located in Michigan. However, it developed at the trial of this cause, by testimony not disputed, that although a railroad carrying one million tons of freight per mile might be reasonably promising, yet any railroad in order to be considered profitable ought

to carry at least two million tons of freight per mile per annum. Trying to mesh the result of its assessment with its test, defendant lopped off from the system total the physical value of the 500 miles of plaintiffs' railroad that carried less than two million tons per mile of freight per year. In doing this, we believe that the Tax Commission failed to allow for the fact that all of those 500 miles of non-profitable railroad are located in the State of Michigan and should not be used as a deduction against the entire system. At the same time these properties, though not such a part of the railroad as would call for reconstruction today, nevertheless have some physical value and cannot be eliminated entirely. West v. Chesapeake & P. Tel. Co., 295 U.S. 662, 55 S.Ct. 894, 79 L.Ed. 1640.

We therefore feel that if the ratio used and suggested by the courts in the Adams and Megan cases, supra, was reasonable at 20 percent, it would be equitable and fair that a ratio in this case be established at 42½ percent for each, the capitalized earnings (entirely as advanced by the railroad); the stock and bond values (entirely as reported by the railroads to the State Board) and a 15 percent value placed upon the cost of reproduction less depreciation. This gives a ratio of almost six to one as against reproduction less depreciation and surely cannot be complained against by plaintiffs as giving too much weight to that factor.

On this theory our computations indicate that the assessed valuation of plaintiffs' railroads in 1935 should have been $17,411,-575 instead of $20,400,000 and that the railroads were assessed that year a total of $89,026.07 more than they should have been.

■ In our computation on the above basis for the years 1936 and 37, we find that the tax resulting would have been slightly more than it really was, but these actions not being subject to counter-claim, those assessments will not be disturbed. Accordingly insofar as the years 1936 and 1937 are concerned, the permanent injunction is denied and the bills of complaint and temporary injunctions dismissed. The amount of $365,334.20 having already been paid by plaintiffs for 1935, the court finds that in the 1935 assessment an additional sum of $77,983.85 is now due and defendant is enjoined from the collection of any and all taxes in excess thereof.

The entire balance due from plaintiffs to defendant for the three years is $428,401.31 with interest.

The decree as prepared, however, will leave the taxing authorities free to make a new assessment if they wish to do so for the year 1935 and it will also provide that it is without prejudice to the right of the taxing authorities, if they so desire, to again assess plaintiffs' railroads for said year.